United States District Court
Southern District of Texas
**ENTERED**
May 08, 2023
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| MARATHON OIL COMPANY, *Plaintiff* | § § § | |
| v. | § § | CIVIL ACTION NO. 4:21-CV-1262 |
| KOCH ENERGY SERVICES, LLC, *Defendant.* | § § § | |

## MEMORANDUM AND RECOMMENDATION

Before the Court are Plaintiff Marathon Oil Company's Motion for Partial Summary Judgment (ECF 67) and Defendant Koch Energy Services, LLC's Motion for Partial Summary Judgment. ECF 114. Having considered the Parties' submissions and the applicable law, the Court RECOMMENDS that Plaintiff's Motion be GRANTED and Defendant's Motion be DENIED.[1]

### I.   Factual and Procedural Background

#### A.   Factual Background

This case involves a dispute between Plaintiff Marathon Oil Company ("Marathon") and Defendant Koch Energy Services ("Koch") over Marathon's declaration of Force Majeure in February 2021 during Winter Storm Uri and pursuant to an agreement for the sale and purchase of natural gas between Marathon and Koch.

---

[1] The District Judge referred this case to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  ECF 29.

### 1.  The NAESB Base Contract

On October 1, 2009, Marathon and Koch entered into a Base Contract for the Sale and Purchase of Natural Gas ("Base Contract") using a form published by the North American Energy Standards Board ("NAESB").  ECF 67-3 at 1.  The Base Contract incorporates for all purposes the General Terms and Conditions for Sale and Purchase of Natural Gas published by the NAESB.  *Id.* at 2-13.  The Base Contract does not obligate the Parties to sell or purchase natural gas from each other, but its General Terms and Conditions are intended to facilitate and govern any future sale and purchase of natural gas between them. *Id.* at 3, § 1.1.  The Base Contract defines the "Buyer" as the "party receiving Gas" and the "Seller" as the "party delivering Gas."  *Id.*

The Base Contract requires the Parties to choose among certain provisions that will govern their future transactions and supplies the default in the absence of an election.  *Id.* at 2.  For example, when choosing between an Oral or Written Transaction Procedure, Marathon and Koch selected the Oral Transaction Procedure for future transactions:

> 1.2. The parties will use the following Transaction Confirmation Procedure.  Any Gas purchase and sale transaction may be effectuated in an EDI [electronic data interchange] transmission or telephone conversation with the offer and acceptance constituting the agreement of the parties.  The parties shall be legally bound from the time they so agree to transaction terms and may each rely thereon. . . .  [T]he parties agree that Confirming Party shall, and the other party may, confirm a telephonic transaction by sending the other party a Transaction Confirmation . . . within three Business Days of a transaction covered by this Section 1.2 (Oral Transaction Procedure) provided that the failure to send a Transaction Confirmation shall not invalidate the oral agreement of the parties.

*Id*. at 2 (election of Oral Transaction Procedure), and at 3, § 1.2.  A "Confirming Party" is defined in the Base Contract's General Terms and Conditions as "the party designated in the Base Contract to prepare and forward Transaction Confirmations to the other party."  *Id*. at 4, § 2.8.  The Base Contract between Marathon and Koch designated "Confirming Party" as "Seller or Buyer."  *Id*. at 2, § 2.8.

### 2.  The September 4, 2020 and September 17, 2020 transactions

The Parties entered into two relevant transactions for the sale and purchase of natural gas under the Base Contract.  ECF 1-2 at ¶¶ 12-13.  On September 4, 2020, the Parties agreed that Marathon would sell and Koch would purchase 30,000 MMBTU's of gas per day on a Firm[2] basis from November 1, 2020 until March 31, 2021.  ECF 67-4; ECF 67-6.  That same day, the Parties sent each other Transaction Confirmations for the September 4 transaction, with Marathon sending Transaction Confirmation No. 346595 and Koch sending Transaction Confirmation No. 885742.  ECF 67-4; ECF 67-6.

On September 17, 2020, the Parties agreed that Marathon would sell and Koch would purchase an additional 20,000 MMBTU's on a Firm basis, for the same time period, resulting in an obligation to purchase or sell a total of 50,000 MMBTU's per day.  ECF 67-5; ECF 67-7.  Again, the Parties sent each other Transaction Confirmations the same day of the transaction, with Marathon sending Transaction Confirmation No. 346762 and Koch sending Transaction Confirmation No. 890984.  ECF 67-5; ECF 67-7.  Although the Parties each

---

[2] Transactions under the Base Contract may be "Firm" or "Interruptible."  ECF 67-3 at 3, § 1.1.  "Firm" means "that either party may interrupt its performance without liability *only to the extent that such performance is prevented for reasons of Force Majeure*."  *Id.* at 4 (emphasis added).

3

sent Transaction Confirmations on the day of the transaction, with respect to each transaction, Koch's were sent before Marathon's. *Compare* ECF 71-7 at 2 *with* ECF 71-9 at 2 and ECF 71-8 at 2 *with* ECF 71-10 at 2.

The Transaction Confirmations sent by each party contain identical terms for volume, price, date range, and a "Firm" obligation. *Compare* ECF 67-4 *and* ECF 67-5 *with* ECF 67-6 *and* ECF 67-7. The Transaction Confirmations also both identify the Delivery Point as Bennington Hub, which is a "centralized physical gas hub in Oklahoma where six natural gas pipelines meet" (ECF 71 at 5). *Compare* ECF 67-4 *and* ECF 67-5 *with* ECF 67-6 *and* ECF 67-7. In addition, Marathon's Transaction Confirmations designate the Pipeline as "Midship Pipeline Company" ("Midship"), a pipeline that flows *into Bennington Hub*, while Koch's Transaction Confirmations designate the Pipeline as "MEP", the Midcontinent Express Pipeline, which flows *out of Bennington Hub*.[3] ECF 71-5 at ¶ 5. Meanwhile, the General Terms of the Base Contract provide that the "Seller shall have the sole responsibility for transporting the Gas *to the Delivery Point(s)*" and the "Buyer shall have the sole responsibility for transporting the Gas *from the Delivery Point(s)*." ECF 67-3 at 6, § 4.1 (emphasis added).

### 3. Winter Storm Uri and Marathon's declaration of Force Majeure

In February 2021, Texas and Oklahoma experienced unusually cold temperatures, ice,

---

[3] Sometime in October 2020, Koch sent revised Transaction Confirmations changing its designated pipeline from "MEP" to "GSPL" or Global South Pipeline Company. ECF 67-8; ECF 67-9. Like MEP, GSPL *flows out of Bennington Hub*. ECF 71-5 at ¶ 5. Although Koch's revised Transaction Confirmation was not timely pursuant to the Contract terms, (ECF 67-3 at 3, § 1.2), Marathon's trader assented to the change. ECF 71-15.

and snow during an event referred to as Winter Storm Uri.  ECF 1-2 at ¶ 14.  On February

15, 2021, Marathon notified Koch that due to freezing temperatures, its ability to ship gas

via the Midship Pipeline was affected and that, per "the express provisions of the Base

Contract"—it was invoking the Force Majeure Clause to be "relieved of [its] obligation to

deliver gas."  *Id.* at ¶¶ 21-22.

The Force Majeure provisions in the Base Contract's General Terms and Conditions

relieve a party from liability for failing "to perform a Firm obligation to the extent such

failure was caused by Force Majeure," which means "any cause not reasonably within the

control of the party claiming suspension, as further defined in Section 11.2."  ECF 67-3 at

10, § 11.1.  Section 11.2 specifically identifies events or situations that shall be considered

Force Majeure:

> 11.2.   Force Majeure shall include, but not be limited to, the
> following: . . . (ii) *weather related events affecting an entire
> geographic region, such as low temperatures which cause
> freezing or failure of wells or lines of pipe;* (iii) interruption
> and/or curtailment of Firm transportation and/or storage by
> Transporters . . . .   Seller and buyer shall make reasonable
> efforts to avoid the adverse impacts of a Force Majeure and to
> resolve the event or occurrence once it has occurred in order to
> resume performance.

*Id.* at 10, § 11.2 (emphasis added).  Section 11.3 of the Base Contract's General Terms and

Conditions also specifically identifies events or situations that will *not* entitle a party to be

released from liability for failure to perform:

> 11.3.   Neither party shall be entitled to the benefit of the
> provisions of Force Majeure to the extent performance is
> affected by any or all of the following circumstances:  . . . (ii)
> the party claiming excuse failed to remedy the condition and to
> resume the performance of such covenants or obligations with

> reasonable dispatch; or (iii) economic hardship, to include, without limitation, Seller's ability to sell Gas at a higher or more advantageous price than the Contract Price, Buyer's ability to purchase Gas at a lower or more advantageous price than the Contract Price . . . ; (iv) the loss of Buyer's market(s) or Buyer's inability to use or resell Gas purchased hereunder, except, in either case, as provided in Section 11.2; or (v) the loss or failure of Seller's gas supply or depletion of reserves, except, in either case, as provided in Section 11.2.

*Id*. at 10, § 11.3.

Koch rejected Marathon's declaration of Force Majeure in letters sent on March 10, 2021 (ECF 1-2 at ¶ 24) and March 12, 2021 (ECF 67-16).  Koch later invoiced Marathon for $9,820,964 in "cover damages" resulting from Marathon's failure to comply with the Parties' agreement during the period of Winter Storm Uri.  ECF 1-2 at ¶ 29.  Eventually, Koch "netted" $9,820,964 from amounts Koch owed to Marathon for purchases of natural gas, conduct which Marathon alleges is a breach of the Parties' Contract.  *Id.* at ¶¶ 44-47.

### B.  Procedural Background

Marathon filed suit in the 152nd Judicial District Court of Harris County, Texas, seeking a declaration that: Winter Storm Uri and its impacts on Marathon's operations constitute Force Majeure; Marathon was excused from performance by its declaration of Force Majeure; and Marathon owes no damages to Koch.  *Id.* at ¶ 39.  Marathon also claims breach of contract against Koch for "impermissible netting."  *Id*. at 8-9.

Invoking this Court's diversity jurisdiction, Koch removed the case to the United States District Court for the Southern District of Texas.  ECF 1.  Koch filed a Second Answer, Affirmative Defense, and Counterclaim alleging that Marathon's declaration of Force Majeure was improper, and therefore its failure to perform amounted to a breach of

6

the Contract.  ECF 25 at ¶¶ 65-72.

This Court granted Marathon leave to file an early Motion for Partial Summary Judgment limited only to "the legal interpretation of the contract as it relates to the parties' obligations under the Force Majeure and related provisions of the contract."  ECF 60. Marathon filed a Motion for Partial Summary Judgment asking the Court to determine as a matter of law that "[t]he Base Contract does *not* require Marathon to purchase available replacement gas on the spot market . . . , buy back its delivery obligation to Koch, or deliver gas to Koch at the Bennington Hub on a pipeline other than the Midship Pipeline" before declaring Force Majeure.  ECF 67 at 23 (emphasis in original).

Koch responded to Marathon's Motion for Partial Summary Judgment (ECF 71) and later filed its own Motion for Partial Summary Judgment (ECF 114).  Koch makes similar arguments in both its Response and Motion for Partial Summary Judgment.  It contends that only Koch's Transaction Confirmations control the Parties' transactions and therefore Koch never agreed to Marathon's designation of the Midship pipeline.  ECF 71 at 8-9, 14-19; ECF 114 at 6-10.  Koch also contends Marathon was not entitled to declare Force Majeure because multiple options for performance existed, including delivery on a different pipeline, the purchase of gas on the spot market, or "buying back" the delivery obligation owed to Koch. ECF 71 at 13-27.

In addition to asking the Court to interpret the Contract as a matter of law, both Parties also cite to extrinsic evidence to support their own interpretations.  Although the Parties promote competing interpretations, neither contends the agreement is ambiguous. The Court also perceives no ambiguity that would require it to examine extrinsic evidence

to determine the intent of the agreement as written. Therefore, the Court will interpret the agreement as a matter of law and without resort to extrinsic evidence.

The Parties have fully briefed the issues, having cumulatively docketed over a dozen separate filings in connection with the motions for partial summary judgment. *See* ECF 67 (Marathon's Motion for Partial Summary Judgment); ECF 71 (Koch's Response); ECF 73 (Marathon's Reply); ECF 94 (Koch's letter response to the Court); ECF 99 (Marathon's letter response to the Court); ECF 114 and 115 (Koch's Motion for Partial Summary Judgment and Exhibits); ECF 124 (Marathon's Response to Koch's Motion for Partial Summary Judgment); ECF 128 (Koch's Reply to its Motion for Partial Summary Judgment). Four of the filings are letter briefs submitted in response to two recent district court opinions from the Northern and Southern Districts of Texas which address declarations of force majeure during Winter Storm Uri under agreements utilizing the same NAESB Base Contract at issue in this case. ECF 107 (Marathon's letter discussing a recently decided case in the Northern District of Texas); ECF 109 (Koch's letter discussing the same case); ECF 127 (Marathon's letter regarding a recent opinion by Judge Lake); ECF 130 (Koch's letter discussing the same opinion). The Parties' respective Motions for Partial Summary Judgment are ripe for determination.

## II.   Legal Standards

In this diversity case involving a Contract governed by Texas law, the Court applies Texas law of contract interpretation. ECF 67-3 at 2, 11, § 15.5; *Barden Miss. Gaming, LLC v. Great N. Ins. Co*., 638 F.3d 476, 478 (5th Cir. 2011) (stating that, in a diversity case, the substantive law of the forum state applies). When construing a written contract, the Court's

task is to "ascertain the true intentions of the parties as expressed in the writing itself." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011).  This analysis begins with the contract's express language.  *Id.*  Courts "give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996); *see also TEC Olmos, LLC v. ConocoPhillips Co.*, 555 S.W.3d 176, 181 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (applying these principles in the context of a contractual force majeure provision).

Courts "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)) (emphasis omitted).  Each provision must be considered in the context of the contract as a whole. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019). The court "may neither rewrite the parties' contract nor add to its language." *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003).

If a contract can be given a "certain or definite legal meaning or interpretation," then it is unambiguous, and may be interpreted as a matter of law. *Pathfinder Oil & Gas*, 574 S.W.3d at 889.  "Whether a contract is ambiguous is [] a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Id.* (quoting *Coker*, 650 S.W.2d at 394).  "An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of

creating an ambiguity or to give the contract a meaning different from that which its language imports." *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008).

## III.   Analysis

### A. Both Marathon and Koch's Transaction Confirmations are binding and part of a single, integrated agreement.

Marathon invites the Court to decide its Motion for Partial Summary Judgment by relying exclusively on the terms of the Base Contract, arguing that "[r]esolving the transaction confirmations is not necessary to resolve the motion." ECF 73 at 12. However, as noted above, the standards of contract interpretation require a court to "examine the contract as a whole to harmonize and effectuate all of its provisions so that none are rendered meaningless." *TEC Olmos*, 555 S.W.3d at 181. The Base Contract defines the Contract as:

> the legally-binding relationship established by (i) the Base Contract, (ii) any and all binding Transaction Confirmations and (iii) where the parties have selected the Oral Transaction Procedure in Section 1.2 of the Base Contract, any and all transactions that the parties have entered into through an EDI transmission or by telephone, but that have not been confirmed in a binding Transaction Confirmation, *all of which shall form a single integrated agreement between the parties*.

ECF 67-3 at 4, § 2.9 (setting forth the definition of "Contract") (emphasis added). Without doubt, the Parties' entire agreement consists of the Base Contract, its General Terms and Conditions, and "any and all" binding Transaction Confirmations. *Id.* Furthermore, "Transaction Confirmation" is defined in the Base Contract's General Terms and Conditions as "a document . . . setting forth the *terms of a transaction* formed pursuant to Section 1 for a particular Delivery Period." *Id.* at 5, § 2.32 (emphasis added); *see also Va. Power Energy Mktg., Inc. v. Apache Corp.*, 297 S.W.3d 397, 402 (Tex. App.—Houston [14th Dist.] 2009,

pet. denied) ("Thus, the parties' entire agreement is governed by both the general Base Contract and the more specific Confirmation that would include the sales terms as to each individual transaction."). Furthermore, several courts interpreting NAESB Base Contracts have looked to the Transaction Confirmations incorporated into the contract to determine whether a party was permitted to invoke Force Majeure. *See, e.g.*, *Hess Corp. v. ENI Petroleum US, LLC*, 435 N.J. Super. 39, 49 (N.J. App. Div. 2014) ("[A]bsent the designation of the Independence Trail Pipeline as the transporter in the Base Contract or Transaction Confirmation, [defendant] cannot rely upon *force majeure* in this context to excuse performance."); *see also Va. Power*, 297 S.W.3d at 406 (holding that the court could not limit a seller's performance to "a specific supply source" where the Transaction Confirmations did not expressly provide such a limitation).

At the outset the Court must interpret the general provisions of the Base Contract to determine which of the Parties' Transaction Confirmations are binding and therefore part of a single integrated agreement. As a result, the Court addresses first Koch's Motion for Partial Summary Judgment which argues that: (1) either Buyer or Seller—but not both—can confirm a transaction; (2) the first Transaction Confirmation controls the Parties' agreement absent a written objection; (3) Koch's Transaction Confirmations were sent first for each deal; (4) Marathon did not provide written notice of an objection to either of Koch's confirmations; and (5) Koch never expressly agreed to Marathon's designation of the Midship Pipeline as the sole mode of delivery. ECF 114 at 10.

### 1. The Base Contract allows more than one binding Transaction Confirmation per transaction.

Koch puts forward a variety of reasons for why only Koch's Transaction Confirmations are binding.  First, Koch argues that only a single party, either the Buyer *or* the Seller, can issue a binding transaction confirmation and that Koch "confirmed first."  *Id.*; ECF 71 at 8, 14; ECF 114 at 10.  The Base Contract's General Terms and Conditions define "Confirming Party" as "the party designated in the Base Contract to prepare and forward Transaction Confirmations to the other party."  ECF 67-3 at 4, § 2.8.  Koch argues that the use of the disjunctive "or" limits "Confirming Party" to only "Buyer" or "Seller," and that both cannot be a Confirming Party in a single transaction. ECF 71 at 14. But when read in the context of other contractual provisions discussed below which expressly allow multiple Transaction Confirmations to govern a single transaction, the use of the word "or" when designating "Buyer or Seller" does not demonstrate that the Parties intended that only one party may send a Transaction Confirmation and only one party's Transaction Confirmations may govern a transaction.

Koch also argues that "nothing in the Base Contract allows parties to layer or 'read together' multiple confirmations[,]" and therefore the first Transaction Confirmation controls the Parties' agreement.  ECF 114 at 8, 10.  The Court disagrees with Koch's interpretation because the Base Contract's General Terms and Conditions expressly state that Transaction Confirmations sent by more than one party may govern the same transaction. First, the Oral Transaction Procedure in the Base Contract expressly states that "Confirming Party shall, *and the other party may*," generate and send a Transaction Confirmation to the

other party.  *Id.* at 3, § 1.2 (emphasis added).  The very definition of "Contract" includes "*any and all binding Transaction Confirmations*, all of which shall form a single integrated agreement between the parties[,]" a definition which defeats Koch's argument that nothing in the Base Contract allows the Parties to "layer" or "read together" multiple confirmations. *Id.* at 4, § 2.9 (emphasis added).  Nothing in the definition of "Contract" prevents multiple binding transaction confirmations from governing.  In fact, the Base Contract expressly references *timely sent Transaction Confirmations governing the same transaction*:

> If there are any material differences between *timely sent Transaction Confirmations governing the same transaction*, then neither Transaction Confirmation shall be binding until or unless such differences are resolved including the use of any evidence that clearly resolves the differences in the Transaction Confirmations.

*Id.* at 3, § 1.3 (emphasis added).  The Contract clearly contemplates that multiple Transaction Confirmations may govern the same transaction to the extent the confirmations are not materially different.  A contrary interpretation would render meaningless the above-quoted procedure in Section 1.3 for resolving material differences between timely sent Transaction Confirmations before they are integrated into the Contract.

It is undisputed in this case that Marathon and Koch both sent timely Transaction Confirmations.  As such, each was both a "receiving party" and a "sending party."  It is also undisputed that neither Marathon nor Koch notified the other that the terms of the received Transaction Confirmation were materially different from the receiving party's understanding of the agreement.  According to Section 1.3 of the Base Contract's General Terms and Conditions,

> [t]he failure of the receiving party to so notify the sending party in writing by the Confirm Deadline *constitutes the receiving party's agreement to the terms of the transaction described in the sending party's Transaction Confirmation*.

*Id.* (emphasis added).  Thus, according to Section 1.3, the terms contained in a Transaction Confirmation generally are deemed to have been agreed upon absent written notice of an objection to those terms by the Confirm Deadline.  However, Section 1.3 does not require a written objection by the Confirm Deadline if the receiving party has "previously" sent a Transaction Confirmation to the sending party:

> If a sending party's Transaction Confirmation is materially different from the receiving party's understanding of the agreement referred to in Section 1.2, *such receiving party shall notify the sending party via facsimile, EDI, or mutually agreeable electronic means by the Confirm Deadline, unless such receiving party has previously sent a Transaction Confirmation to the sending party*.

*Id.* (emphasis added).  Koch interprets the word "previously" to mean that only the *first* party to send a Transaction Confirmation is released from the obligation to notify its counter-party of a material difference between a Transaction Confirmation and the recipient's understanding of the transaction.  ECF 71 at 13-15; ECF 114 at 9.  As a result, Koch argues that it was not required to notify Marathon that Marathon's Transaction Confirmations naming the Midship pipeline were materially different from Koch's understanding of the agreement.  ECF 114 at 9.  Koch also argues that because Marathon had not sent its own Transaction Confirmations *previously to receiving Koch's Transaction Confirmations*, Marathon was obligated to send written notice of a material difference to Koch or else be deemed to have agreed to the terms of Koch's Transaction Confirmations, which do not identify the Midship pipeline.  *Id.*

The meaning of "previously" in Section 1.3 must be read in relation to the portion of the sentence that precedes it, as well as the entire provision and the Contract as a whole:

> If a sending party's Transaction Confirmation is materially different from the receiving party's understanding of the agreement referred to in Section 1.2, such receiving party *shall notify the sending party* via facsimile, EDI, or mutually agreeable electronic means *by the Confirm Deadline, unless such receiving party has previously sent a Transaction Confirmation to the sending party*. The failure of the receiving party *to so notify the sending party in writing by the Confirm Deadline* constitutes the receiving party's agreement to the terms of the transaction described in the sending party's Transaction Confirmation.

ECF 67-3 at 3, § 1.3 (emphasis added).  Understanding the operation of Section 1.3 as written requires paying attention to time frames for sending Transaction Confirmations and the Contract's definition of Confirm Deadline.

The Contract sets the time frame for a timely Transaction Confirmation:  A party may send a Transaction Confirmation "*within three Business Days of a transaction* covered by this Section 1.2 (Oral Transaction Procedure)[.]"   *Id.* at 3, § 1.2 (emphasis added). Accordingly, with respect to the September 4, 2020 transaction, the Parties were entitled to send Transaction Confirmations up until September 9, 2020.  With respect to the September 17 transaction, the Parties had until September 22, 2020 to send Transaction Confirmations.

The Confirm Deadline, however, is specific to a particular Transaction Confirmation and begins to run only once a party *receives* the Transaction Confirmation. *Id.* at 4, § 2.7 ("'Confirm Deadline' shall mean 5:00 p.m. in the receiving party's time zone on the second Business Day following the Day a Transaction Confirmation is received . . . .").  Even though Koch sent its respective Transaction Confirmations approximately two hours before

15

Marathon did, both Parties sent Transaction Confirmations on the day of the transaction. Because the Parties both received Transaction Confirmations on the same day, they share a Confirm Deadline as to their counter-party's Transaction Confirmation.  For example, calculation of the Parties' respective Confirm Deadlines for the September 4, 2020 transaction is demonstrated below:

| September 4, 2020 Transaction | Transaction Confirmation sent | Deadline for timely Transaction Confirmation | Receiving party Confirm Deadline |
|---|---|---|---|
| KOCH | September 4 | September 9 | 5:00 p.m. on September 8 |
| MARATHON | September 4 | September 9 | 5:00 p.m. on September 8 |

The Court interprets Section 1.3 to mean that a receiving party is not obligated to notify the sending party of a material difference between the Transaction Confirmation and the receiving party's understanding of the oral agreement if *before the Confirm Deadline* "*the receiving party ha[d] previously sent a Transaction Confirmation to the sending party.*" *Id.* at 3, § 1.3 (emphasis added).  However, if the receiving party has not sent its own Transaction Confirmation prior to the Confirm Deadline for its counter-party's confirmation, the failure to send notice of a material difference results in the receiving party's agreement to the terms in the sending party's Transaction Confirmation.

Where both parties send each other Transaction Confirmations on the day of the transaction as Koch and Marathon did, and where, as here, neither party objects to the terms in the Transaction Confirmation as materially different from their agreement, both parties'

16

Transaction Confirmations are deemed accepted and binding if they do not contain material differences. ECF 67-3 at 3, § 1.3. The operation of Section 1.3 with respect to the September 4 transaction is set forth below:

| September 4 Transaction | Transaction Confirmation ("TC") sent | Deadline for timely TC | Receiving Party Confirm Deadline | Required as receiving party to send objection? | Are the terms of sending party's TC deemed accepted? |
|---|---|---|---|---|---|
| Koch | September 4 | September 9 | 5:00 p.m. on September 8 | No-TC sent prior to Confirm Deadline | Yes, if not materially different from Marathon's |
| Marathon | September 4 | September 9 | 5:00 p.m. on September 8 | No-TC sent prior to Confirm Deadline | Yes, if not materially different from Koch's |

If the parties' Transaction Confirmations contain material differences, Section 1.3 provides that neither is binding until and unless the differences are resolved:

> If there are any material differences between timely sent Transaction Confirmations governing the same transaction, then *neither Transaction Confirmation shall be binding until or unless such differences are resolved* including the use of any evidence that clearly resolves the differences in the Transaction Confirmations.

*Id.* (emphasis added).

As demonstrated above, Koch's interpretation of the Contract as relieving only the *first* sending party of the obligation to provide separate written notice of a material difference ignores the definition of "Confirm Deadline" and the use of that defined term in both the first and second sentences of Section 1.3:

> If a sending party's Transaction Confirmation is materially different from the receiving party's understanding of the

> agreement referred to in Section 1.2, such receiving party shall notify the sending party via facsimile, EDI, or mutually agreeable electronic means *by the Confirm Deadline,* unless such receiving party has previously sent a Transaction Confirmation to the sending party.  The failure of the receiving party to so notify the sending party *in writing by the Confirm Deadline* constitutes the receiving party's agreement to the terms of the transaction described in the sending party's Transaction Confirmation.

*Id.* (emphasis added).  The use of the defined term "Confirm Deadline" in the second sentence of Section 1.3 demonstrates the Parties' intent that the failure to object to a material difference "by the Confirm Deadline" constitutes acceptance of the terms in the sending party's confirmation, *unless* previously to the Confirm Deadline, the receiving party has sent its own confirmation.  Koch's interpretation not only ignores the definition of Confirm Deadline, it also eliminates the potential for two Transaction Confirmations to govern the same transaction, which in turn, would render the third sentence in Section 1.3 meaningless:

> If there are any material differences between *timely sent Transaction Confirmations* governing the same transaction, then neither Transaction Confirmation shall be binding until or unless such differences are resolved including the use of any evidence that clearly resolves the differences in the Transaction Confirmations.

*Id.* (emphasis added).  A *timely sent Transaction Confirmation* is one sent within three Business Days of the transaction.  Koch's interpretation of the contract as requiring the first-sent Transaction Confirmation to govern the Parties' agreement both conflicts with the language in Section 1.2 allowing both Parties up to three Business Days to send a Transaction Confirmation and would eliminate the possibility that two *timely sent Transaction Confirmations* govern the transaction.    Thus, Koch's interpretation would render

meaningless the three Business Day period in Section 1.2 for sending a Transaction Confirmation and the provision in Section 1.3 for reconciling timely sent Transaction Confirmations that contain material differences.

The following hypothetical, which assumes neither party sends a written notice objecting to the terms of the sending party's Transaction Confirmation, further illustrates the operation of Section 1.3:

| Hypothetical Monday, May 1 Transaction | Transaction Confirmation ("TC") sent | Deadline for timely TC | Receiving party Confirm Deadline | Required as receiving party to send objection? | Are the terms of sending party's TC deemed accepted? |
|---|---|---|---|---|---|
| Party A | May 1 | May 4 | 5:00 p.m. on May 8 | No-TC sent prior to Confirm Deadline | Yes |
| Party B | May 4 | May 4 | 5:00 p.m. on May 3 | Yes-TC not sent prior to Confirm Deadline | No |

In the above hypothetical, Party B's own Transaction Confirmation was not sent prior to its Confirm Deadline as the recipient of Party A's Transaction Confirmation, or 5:00 p.m. on May 3. Pursuant to Section 1.3, Party B's failure to object in writing or send its own Transaction Confirmation by the 5:00 p.m. May 3 confirm Deadline, constitutes Party B's acceptance of the terms in Party A's Transaction Confirmation. However, Party A's failure to object does not constitute acceptance of the terms in Party B's Transaction Confirmation because Party A's own Transaction Confirmation was sent previously to Party A's confirm Deadline for Party B's Transaction Confirmation, or 5:00 p.m. on May 8. In this hypothetical, the operation of Section 1.3 results in only Party A's Transaction Confirmation

being accepted and therefore binding.

As fully explained above, the word "previously" in Section 1.3 refers to the receiving party's Confirm Deadline rather than the order of the Parties' Transaction Confirmations. This interpretation ensures that, *by the Confirm Deadline*, the sender of a Transaction Confirmation is notified of a material difference either by written notice or by a Transaction Confirmation sent previously to the Confirm Deadline. This interpretation also prevents language in Section 1.2 and 1.3 from being superfluous or meaningless. Finally, this interpretation is supported by similar language in the Base Contract's Written Transaction Procedure, ECF 67-3 at 3, § 1.2 which states:

> **Written Transaction Procedure**
> 1.2 The parties will use the following Transaction Confirmation procedure. Should the parties come to an agreement regarding a Gas purchase and sale transaction for a particular Delivery Period, the Confirming party shall, and the other party may, record that agreement on a Transaction Confirmation and communicate such Transaction confirmation by facsimile, EDI or mutually agreeable electronic means, to the other party by the close of the Business Day following the date of agreement. The parties acknowledge that their agreement will not be binding until the exchange of nonconflicting Transaction Confirmations or *the passage of the Confirm Deadline without objection from the receiving party, as provided in Section 1.3*.

Because both Koch and Marathon sent each other Transaction Confirmations "previously" to the Confirm Deadline, neither party's failure to send written objections constituted assent to the terms in the other party's Transaction Confirmation. Therefore, pursuant to Section 1.3, both Parties' Transaction Confirmations are binding to the extent

they do not contain material differences.[4]  *Id.* at 3, § 1.3.

## 2. Koch's and Marathon's timely sent Transaction Confirmations do not contain material differences and therefore are incorporated into the Contract.

In its Response to Marathon's Motion for Partial Summary Judgment Koch argues that "[Marathon's] transaction confirmation[s are] not materially different" from Koch's. ECF 71 at 8; 67-12 at 7 ("The transportation pathway Marathon chose to deliver the gas to the Bennington Hub was immaterial.").  In its own Motion for Partial Summary Judgment, Koch takes a different position, arguing that Marathon's Confirmations designating delivery via Midship pipeline, "inserted a new—and never agreed upon—material term that radically altered the parties' deals[,]" and thus implicate the procedures under Section 1.3 of the Base Contract for resolving "material differences in timely sent transaction confirmations governing the same transaction."  ECF 114 at 2, 7-8; ECF 67-3 at 3, § 1.3.  Meanwhile, Marathon has continuously maintained that the Parties' respective Transaction Confirmations do not contain material differences.  ECF 124 at 11.

The only manner in which the Parties' respective Transaction Confirmations are not identical is that Marathon's confirmations designate a pipeline flowing *to Bennington Hub* and Koch's identify a pipeline flowing *from Bennington Hub*.  According to the Base

---

[4] In the event a *binding* Transaction Confirmation conflicts with the terms of an agreement made pursuant to the oral transaction procedure, the terms of the *binding* Transaction Confirmation take priority over the oral transaction.  ECF 67-3 at 3, § 1.3 ("In the event of a conflict among the terms of (i) a binding Transaction Confirmation pursuant to Section 1.2, (ii) the oral agreement of the parties which may be evidenced by a recorded conversation . . . , (iii) the Base Contract, and (iv) these General Terms and Conditions, the terms of the documents shall govern in the priority listed in this sentence.").  This priority of documents only applies to conflicts between *binding* Transaction Confirmations and the oral transaction or other documents.  This priority of documents does not govern the determination of which Transaction Confirmations are binding.

Contract, the "Seller shall have *the sole responsibility for transporting the Gas to the Delivery Point(s)*" and the "Buyer shall have *the sole responsibility for transporting the Gas from the Delivery Point(s)*." ECF 67-3 at 6, § 4.1 (emphasis added). Marathon's identification of the pipeline flowing *to Bennington Hub* corresponds with its sole responsibility to transport natural gas *to the Delivery Point*, while Koch's identification of a pipeline flowing *from Bennington Hub* corresponds with its sole responsibility to transport the natural gas *from the Delivery Point*. Considering the entire agreement as a whole, the Transactions Confirmations in which Marathon designates the incoming pipeline, do not *materially differ* from Koch's Transaction Confirmations which are silent as to the incoming pipeline. Likewise, the Transaction Confirmations in which Koch designates the outgoing pipeline, do not *materially differ* from Marathon's Transaction Confirmations which are silent as to the outgoing pipeline.

If Koch's Transaction Confirmations designated an *incoming pipeline* then Marathon's confirmation designating the Midship Pipeline would differ from Koch's in a material way. Koch argues that the absence of a designated incoming pipeline in its Transaction Confirmations evidences its intent that Marathon's performance was not limited to the Midship pipeline. ECF 114 at 2. Yet, Koch's Transaction Confirmations are *silent* as to the incoming pipeline and to interpret them as materially different from Marathon's Transaction Confirmations would require adding words to Koch's Transaction Confirmations, something the Court cannot do when interpreting a contract as written. *Schaefer*, 124 S.W.3d at 162.

The Parties' Transaction Confirmations do not contain material differences because

they differ only in the respect that each designates a route or method for transport for which each is solely responsible and to which the counterparty's confirmations are silent.   The Transaction Confirmations are complementary to the extent one set designates routes for transporting gas to the Delivery Point and the other set designates routes for transporting gas from the Delivery Point.   Pursuant to the provisions of Section 1.3, both Parties' Transaction Confirmations are binding and form part of a single integrated agreement between them.  *See* ECF 67-3 at 4, § 2.9 (defining "Contract" as "the legally-binding relationship established by (i) the Base Contract, [and] (ii) any and all binding Transaction Confirmations[.]").

**B.  The Contract did not, as a matter of law, require Marathon to perform by delivering via a different pipeline, purchasing replacement gas on the "spot market, or buying back its delivery obligation rather than declare Force Majeure.**

The General Terms and Conditions of the Base Contract explain that "neither party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was caused by Force Majeure."  *Id.* at 10, § 11.1.   The General Terms and Conditions define Force Majeure as "any cause not reasonably within the control of the party claiming suspension, as further defined in Section 11.2."  *Id*.   Section 11.2, in turn, describes specific examples of Force Majeure events:

> 11.2.   Force Majeure shall include, but not be limited to, the following: . . . (ii) *weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe;* (iii) interruption and/or curtailment of Firm transportation and/or storage by Transporters; . . . Seller and Buyer shall make reasonable efforts to avoid the adverse impacts of a Force Majeure and to resolve the event or occurrence once it has occurred in order to resume performance.

*Id*. at 10, § 11.2.  Section 11.3 of the Contract then describes events that will not entitle a party to benefit from Force Majeure provisions:

> 11.3.   Neither party shall be entitled to the benefit of the provisions of Force Majeure to the extent performance is affected by any or all of the following circumstances: . . . (ii) the party claiming excuse failed to remedy the condition and to resume the performance of such covenants or obligations with reasonable dispatch; or (iii) economic hardship, to include, without limitation, Seller's ability to sell Gas at a higher or more advantageous price than the Contract Price, Buyer's ability to purchase Gas at a lower or more advantageous price than the Contract Price, . . .

*Id*. at 10, § 11.3.

Koch does not deny that Winter Storm Uri was a "*weather related event[] affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe.*"  Instead, Koch argues that Marathon was not entitled to invoke Force Majeure because, despite Winter Storm Uri and its alleged impact on the Midship pipeline, Marathon could have performed its Firm obligation to deliver gas at Bennington Hub by: (1) shipping on a pipeline other than Midship; (2) buying replacement gas on the spot market at Bennington; or (3) buying back[5] the delivery obligation.  ECF 71 at 13-26.  Put differently, Koch contends that Marathon was not "prevented" by Winter Storm Uri from performing its Firm obligation because these methods of performance were available.

Koch's argument that Marathon is not entitled to invoke the Force Majeure provisions relies the Contract's definition of a "Firm" obligation.  Per the Contract, a Firm

---

[5]  "Buying back" refers to an arrangement where, "in exchange for a payment to the buyer, the seller [is] relieved of its obligation to provide the contracted-for volumes of natural gas."  ECF 71-5 at ¶ 10.

obligation means that "either party may interrupt its performance without liability *only to the extent that such performance is prevented* for reasons of Force Majeure[.]"   ECF 67-3 at 4, § 2.19 (emphasis added).   Koch argues that the definition of "prevent" is "to keep from happening or existing."   ECF 71 at 20 (citing Merriam-Webster).   In essence, Koch argues that the Contract's Force Majeure provisions apply only when performance is impossible because the Force Majeure event prevents performance.

### 1. Marathon was not obligated to deliver on a different pipeline.

Koch's argument that Marathon was not entitled to limit its obligation to deliver via the Midship pipeline and therefore was required to deliver on an alternate inbound pipeline, relies on its assertion that Marathon's Transaction Confirmations are neither binding nor incorporated into the Contract.   As discussed in detail above, the Court interprets the Contract to incorporate Marathon's Transaction Confirmations, which designate Midship, an inbound pipeline.   Koch's Transaction Confirmations designate only outbound pipelines.   Therefore, the terms of the Contract do not, as a matter of law, obligate Marathon to deliver on a pipeline other than Midship.   Likewise, and as discussed further below, a declaration of Force Majeure is not limited to situations in which performance is impossible.

### 2. The Contract does not obligate Marathon to buy gas on the spot market.

In the context of Winter Storm Uri, at least two other federal district courts have addressed the argument Koch makes here:  that a seller's performance is not excused unless performance is made impossible or "prevented" by force majeure.  *See MEICO, LLC v. Pioneer Nat. Res. USA, Inc*., Civil Action No. 3:21-CV-1781-B, 2023 WL 2064723, at *6

(N. D. Tex. Feb. 15, 2023) ("First, MEICO argues that to constitute force majeure, an event must render performance literally impossible, citing Section 1.1 and the Oxford English Dictionary definition of "prevent."); *LNG Americas, Inc. v. Chevron Nat. Gas*, Civil Action No. H-21-2226, 2023 WL 2920940, at *8 (S.D. Tex. Apr. 12, 2023) ("Although *MEICO*'s reasoning pertained to a different force majeure provision, Plaintiff's argument similarly requires reading 'prevented or restricted' to require impossibility."). Although each of these two cases involved slightly different force majeure provisions, both courts considered whether a seller may only declare force majeure when performance is "impossible" or "prevented." *MEICO*, 2023 WL 2064723, at *7 ("[T]he Court rejects MEICO's argument that Pioneer cannot claim force majeure unless performance was objectively impossible."); *LNG Americas*, 2023 WL 2920940, at *8 ("The court agrees with the *MIECO* court that 'prevent' as used in this context, does not require impossibility.").

In *MIECO*, Judge Boyle rejected the argument that force majeure cannot be invoked when the seller can purchase gas on the spot market to perform its delivery obligation. *MIECO*, 2023 WL 2064723, at *7 (rejecting as "strained" an interpretation that force majeure applies only if no gas is available anywhere, at any price, that Seller could timely deliver to the designated delivery point). Judge Boyle concluded that MIECO's interpretation of the contract would "make the force majeure provision essentially duplicative of the common law defense of impossibility, thus rendering the force majeure provision meaningless and of no practical legal effect. *MIECO*, 2023 WL 2064723 at *6. Judge Boyle found persuasive the Fifth Circuit's reasoning in *Ergon-West Virginia, Inc. v. Dynegy Marketing & Trade*, a case involving force majeure declarations during Hurricanes

Katrina and Rita.  *Id.*  In that case the Fifth Circuit rejected a similar interpretation of the NAESB Contract, stating

> The Ergon companies' interpretation would make force majeure provisions essentially meaningless because it would mean that a seller could never invoke force majeure so long as there was some gas available anywhere in the world, at any price.

*Ergon-West Va., Inc. v. Dynegy Mktg. & Trade*, 706 F.3d 419, 424 n.5 (5th Cir. 2013).

In the *LNG* case, Judge Lake also refused to interpret the NAESB contract as requiring impossibility of performance before force majeure can be invoked. *LNG Americas*, 2023 WL 2920940, at *8 ("The court agrees with the *MIECO* court that 'prevent,' as used in this context, does not require impossibility.").  Noting that the force majeure provisions expressly list "low temperatures which cause freezing or failures of wells" as a force majeure, Judge Lake wrote that, with respect to the parties' contract, "[i]f the existence of a spot market precluded force majeure, a well-freezing storm would never qualify unless all suppliers lost virtually all of their production feeding the Oasis pipeline." *Id.*  Judge Lake went on to note that "[m]ultiple courts have declined to read force majeure clauses as requiring the unavailability of replacement gas, stating that the force majeure clause would be effectively meaningless."  *Id.* at *8 n.66 (citing *Ergon-West Va.*, 706 F.3d at 424 n.5; *Tejas Power Corp. v. Amerada Hess Corp.*, No. 14-98-00346-CV, 1999 WL 605550, at *3 (Tex. App.—Houston [14th Dist.] Aug. 12, 1999)).  This Court agrees with the courts which have declined to read the NAESB Force Majeure clause as requiring the impossibility of performance.  *Id.*; *see also Va. Power*, 297 S.W. 3d at 404 (interpreting NAESB Contract and concluding that "reasonable efforts" clause in Force Majeure

27

provision did not require alternate delivery).

### 3.     Marathon was not obligated to buy back its delivery obligation.

As just discussed, the Force Majeure provision does not require "impossibility" of purchasing gas on the spot market.  Likewise, Force Majeure is not precluded by a Seller's ability to "buy back" a gas delivery obligation.  The Contract contains no language requiring the Seller to "buy back" its obligation to deliver gas when Force Majeure would otherwise relieve the obligation.  The terms of the Contract make clear that Marathon's obligation is to sell and *deliver* gas.  *See, e.g.*, ECF 67-3 at 3, § 1.1 ("'Seller' refers to the party delivering Gas."); *id.* at 5, § 3.1 (providing that "Seller agrees to sell and deliver" gas); *id.* at 6, § 4.1 ("Seller shall have the sole responsibility for transporting the Gas to the Delivery Point(s).").  The Transaction Confirmations, all of which characterize the transaction as a "Physical Gas Transaction," describe Marathon's responsibilities similarly.  *See, e.g.*, ECF 67-4 ("Seller . . . ha[s] agreed to sell . . . gas on the terms stated below."); ECF 67-6 ("The purpose of this letter is to confirm the terms and conditions of a Physical Gas Transaction . . . .").   Absent from the Base Contract and the Transaction Confirmations is any mention of an obligation to "buy back" gas in the event of an interruption in Seller's ability to deliver gas, and the Court may not "add" such a provision to the Parties' agreement.  *Schaefer*, 124 S.W.3d at 162.

In addition, Koch's interpretation of the contract as requiring Marathon to buy back its obligation would likewise render the Force Majeure provisions meaningless.   As Marathon argues, the option of buying back an obligation is "always possible," and accordingly "Marathon could never declare force majeure" if it were held to such an

obligation.  ECF 67 at 16.  The Court must "examine the contract as a whole to harmonize and effectuate all of its provisions so that none are rendered meaningless."  *Va. Power*, 297 S.W.3d at 402.  Thus, Koch's interpretation of the Contract as requiring Marathon to buy back its delivery obligation when Winter Storm Uri allegedly interfered with its ability to deliver gas is not reasonable.

## IV.   Conclusion and Recommendation

Based on the above, it is RECOMMENDED that Plaintiff Marathon Oil Company's Motion for Partial Summary Judgment (ECF 67) be GRANTED.  Under the terms of the Contract, Plaintiff Marathon Oil Company was not precluded from declaring Force Majeure even if it could have performed by (1) delivering gas to Koch at the Bennington Hub on a pipeline other than the Midship Pipeline; (2) purchasing replacement gas at the Bennington Hub to fulfill its Firm obligations; or (3) buying back all or part of its obligation to deliver natural gas to Defendant Koch Energy Services, LLC.  This Memorandum and Recommendation does not address whether Marathon met all other requirements of Force Majeure.

It is also RECOMMENDED that Defendant Koch Energy Services, LLC's Motion for Partial Summary Judgment (ECF 114) seeking a determination that only Koch's Transaction Confirmations govern should be DENIED.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(C).  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal

conclusions on appeal.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), superseded by statute on other grounds.

Signed on May 08, 2023, at Houston, Texas.

Christina A. Bryan
United States Magistrate Judge