United States District Court
Southern District of Texas
**ENTERED**
February 05, 2024
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION



| | | |
|---|---|---|
| MARATHON OIL COMPANY, *Plaintiff* | § § § | |
| v. | § § | CIVIL ACTION NO. 4:21-CV-1262 |
| KOCH ENERGY SERVICES, LLC, *Defendant.* | § § § § | |

## MEMORANDUM AND RECOMMENDATION

Before the Court is Plaintiff Marathon Oil Company's Motion for Summary Judgment.[1]  ECF 151.  Having considered the Parties' submissions and the applicable law, the Court RECOMMENDS that Plaintiff's Motion be GRANTED in part and DENIED in part.

### I.    Background[2]

In February 2021, Winter Storm Uri brought unusually cold temperatures, ice, and snow to Texas and Oklahoma.  On February 15, 2021, Plaintiff Marathon Oil Company ("Marathon") notified Defendant Koch Energy Services ("Koch") that it was invoking Force Majeure to excuse its obligation under the parties' Base Contract

---

[1] The District Judge referred this case to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  ECF 29.

[2] The facts of this case were set forth in detail with record citations in the Court's May 8, 2023 Memorandum and Recommendation.  ECF 141.  Only a brief summary of relevant facts is set forth here.

(ECF 151-1) to deliver natural gas to Koch at the Bennington Hub via the Midship Pipeline.[3]  ECF 151-10.  Marathon's first notice letter stated that "due to inclement weather and freezing temperatures in Oklahoma, Marathon Oil Company production volumes have been curtailed."  *Id.*  In a second notice letter the same day, Marathon clarified that the weather is "affecting our ability to ship [gas] via the Midship Pipeline," and stated that "upon the occurrence of a Force Majeure event that affects such delivery, we are relieved of our obligation to deliver gas."  ECF 151-11.

Koch rejected Marathon's declaration of Force Majeure and on March 12, 2021, sent Marathon an invoice for $9,820,964 in "cover damages" resulting from Marathon's failure to comply with the Parties' agreement during the period of Winter Storm Uri.  ECF 151-17.  Meanwhile, Marathon sent Koch a March 15, 2021 invoice for $22,150,134.74 for amounts due for Marathon's February 2021 deliveries of natural gas to Koch.  ECF 151-16.  Koch withheld $9,820,964 from its payment of Marathon's March 15, 2021 invoice and asserted the amount was withheld from full payment of the $22,150,134.74 invoice "in accordance with Sections 3.2 and 7.4 of the [Base Contract]."  ECF 151-18.

Marathon filed suit in the 152nd Judicial District Court of Harris County, Texas, seeking declarations that: Winter Storm Uri and its impacts on Marathon's operations constitute Force Majeure; Marathon was excused from performance by

---

[3] The Bennington Hub is a "centralized physical gas hub in Oklahoma where six natural gas pipelines meet."  ECF 141 at 4.

its declaration of Force Majeure; and Marathon owes no damages to Koch. ECF 1-2. Marathon also asserted a claim for breach of contract against Koch for "impermissible netting." *Id.* Invoking this Court's diversity jurisdiction, Koch removed the case to the United States District Court for the Southern District of Texas. ECF 1. The parties filed cross-motions for partial summary judgment. The Court granted Marathon's motion, ruling as follows:

> Under the terms of the Contract,[4] Plaintiff Marathon Oil Company was not precluded from declaring Force Majeure even if it could have performed by (1) delivering gas to Koch at the Bennington Hub on a pipeline other than the Midship Pipeline; (2) purchasing replacement gas at the Bennington Hub to fulfill its Firm obligations; or (3) buying back all or part of its obligation to deliver natural gas to Defendant Koch Energy Services, LLC.

ECF 141 at 29 (footnote added), adopted by ECF 154. The Court expressly did not address "whether Marathon met all other requirements of Force Majeure." *Id.*

Marathon now moves the Court for Summary Judgment rulings that "(1) Marathon properly declared force majeure under the Base Contract, and its performance was therefore excused; (2) Koch breached the Base Contract by engaging in improper netting; and (3) Marathon did not breach the Base Contract."[5]

---

[4] The Court held that the parties' Contract was a single, integrated contract consisting of the Base Contract in the form published by the North American Energy Standards Board (NAESB) and the parties' September 4, 2020 and September 17, 2020 Transaction Confirmations. ECF 141 at 23.

[5] Marathon seeks summary judgment on Koch's breach of contract counterclaim. Marathon's request for declaratory judgment that it properly declared Force Majeure also operates as an affirmative defense to Koch's breach of contract counterclaim. In this Memorandum and Recommendation the Court finds that fact issues preclude summary judgment on Marathon's claim that all of the requirements for a declaration of force majeure were satisfied. Summary judgment on Koch's breach of contract counterclaim is denied for the same reasons without separate analysis. *See* ECF 151 at 2 n.2 ("Because deciding that Marathon properly declared force majeure during the winter storm necessarily requires

3

ECF 151 at 14.  In response to Marathon's Motion for Summary Judgment, Koch argues that fact issues preclude summary judgment.  *See* ECF 160.

## II.    Summary Judgment Standards

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial.  *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001).  Dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the nonmoving party.  *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016).  "An issue is material if its resolution could affect the outcome of the action."  *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 310 (5th Cir. 2002).  If the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and must present evidence such as affidavits, depositions, answers to interrogatories, and admissions on file to show "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor.  *R.L. Inv. Prop., LLC v. Hamm*, 715 F.3d 145, 149 (5th Cir. 2013).  In ruling on a motion for summary

---

a finding that Marathon did not breach the Base Contract, this analysis is applicable to both Marathon's claim for declaratory judgment and Koch's counterclaim for breach of contract.").

judgment the Court does not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." *Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir. 1987). However, "[c]onclus[ory] allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir. 2008) (citation omitted).

## III.   Analysis

### A. Force Majeure

"The scope and effect of a 'force majeure' clause depends on the specific contract language, and not on any traditional definition of the term." *Va. Power Energy Mktg, Inc. v. Apache Corp.*, 297 S.W.3d 397, 402 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). "The party seeking to excuse its performance under a contractual force majeure clause . . . bears the burden of proof to establish that defense." *Va. Power*, 297 S.W.3d at 402.

Section 11 of the parties' Base Contract contains the following language regarding Force Majeure:

11.1   Except with regard to a party's obligation to make payment(s) due under Section 7, Section 10.4, and Imbalance Charges under Section 4, neither party shall be liable to the other for failure to perform a Firm Obligation, to the extent such failure was caused by Force Majeure. **The term "Force Majeure" as employed herein means any cause not reasonably within the control of the party claiming suspension**, as

further defined in Section 11.2.

11.2.  Force Majeure shall include, but not be limited to, the following: (i) physical events such as acts of God, landslides, lightning, earthquakes, fires, storms or storm warnings, such as hurricanes, which result in evacuation of the affected area, floods, washouts, explosions, breakage, or accident or necessity of repairs to machinery or equipment of lines of pipe; *(ii) weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe*; (iii) interruption and/or curtailment of Firm transportation and/or storage by Transporters; (iv) acts of others such as strikes, lockouts or other industrial disturbances, riots, sabotage, insurrections or wars, or acts of terror, and (v) governmental actions such as necessity for compliance with any court order, law, statute, ordinance, regulations, or policy having the effect of law promulgated by a governmental authority having jurisdiction.  *Seller and buyer shall make reasonable efforts to avoid the adverse impacts of a Force Majeure* and to resolve the event or occurrence once it has occurred in order to resume performance.

11.3.   Neither party shall be entitled to the benefit of the provisions of Force Majeure to the extent performance is affected by any or all of the following circumstances:    *(i) the curtailment of interruptible or secondary Firm transportation unless primary, in-path, Firm transportation is also curtailed; (ii) the party claiming excuse failed to remedy the condition and to resume the performance of such covenants or obligations with reasonable dispatch; or (iii) economic hardship, to include, without limitation, Seller's ability to sell Gas at a higher or more advantageous price than the Contract Price,* Buyer's ability to purchase Gas at a lower or more advantageous price than the Contract Price, Buyer's ability to purchase Gas a a lower or more advantage price that the Contract Price, or a regulatory agency disallowing, in whole or in part, the pass through of costs resulting from this Contract; (iv) the loss of Buyer's market(s) or Buyer's inability to use or resell Gas purchased hereunder, except, in either case, as provided in Section 11.2; or (v) the loss or failure of Seller's gas supply or depletion of reserves, except, in either case, as provided in Section 11.2. The party claiming Force Majeure shall not be excused from its responsibility for Imbalance Charges.

\*          \*          \*

> 11.5   The party whose performance is prevented by Force Majeure must provide Notice to the other party.   Initial Notice may be given orally, however, written Notice with reasonable full particulars of the event or occurrence is required as soon as reasonably possible.   Upon providing written Notice of Force Majeure to the other party, the affected party will be relieved of its obligation, from the onset of the Force Majeure event, to make or accept delivery of Gas, as applicable, to the extent and for the duration of Force Majeure, and neither party shall be deemed to have failed in such obligations to the other during such occurrence or event.

\*          \*          \*

ECF 151-1 at 10 (emphasis added).   Based on the plain meaning of the above provisions and in order to meet its summary judgment burden to establish the affirmative defense of Force Majeure as a matter of law, Marathon must demonstrate that:   (1) Winter Storm Uri was an event "not reasonably within the control" of Marathon (§ 11.1), and falls within the scope of weather related events described in § 11.2(ii); (2)  Marathon's failure to perform under the Base Contract was "caused by" Winter Storm Uri (§ 11.1); (3) Marathon made reasonable efforts to avoid the adverse impacts of Winder Storm Uri (§ 11.2); (4) Marathon's entitlement to the benefit of force majeure is not precluded by the conditions set forth in § 11.3; and (5) Marathon gave Koch written notice it was declaring Force Majeure with "reasonably full particulars" as soon as "reasonably possible" (§ 11.5).   For the purposes of the motion at hand, elements 1 and 5 are not disputed.   Understandably, Koch has not argued that Winter Storm Uri was in Marathon's control.   And Koch also has not challenged the

sufficiency of Marathon's notice in its Response, waiving such arguments for purposes of summary judgment.  *See* ECF 160.

      **1.  Fact issues preclude a finding as a matter of law that Winter Storm Uri caused Marathon's performance under the Contract to be impracticable.**

Marathon contends that it was entitled to declare Force Majeure because Winter Storm Uri resulted in (1) curtailed well production and (2) the inability to access the Midship Pipeline.  ECF 151-10; ECF 151-11.  Two recent cases involving claims that Winter Storm Uri prevented a party's delivery of gas have held that a party claiming force majeure need only show that the force majeure event caused its performance to be impracticable, not impossible.  *See LNG Americas, Inc. v. Chevron Nat. Gas*, No. CV H-21-2226, 2023 WL 2920940, at *8 (S.D. Tex. Apr. 12, 2023) (holding that a force majeure event is one that renders a party's performance impossible would make the requirements of "reasonable efforts" and "reasonable dispatch" superfluous, citing *Mieco LLC v. Pioneer Nat. Res. USA, Inc.*, No. 3:21-CV-1781-B, 2023 WL 2064723, at *6 (N.D. Tex. Feb. 15, 2023)).  Furthermore, this Court has already held that the parties' Contract did not require Marathon to deliver gas on a different pipeline, purchase replacement gas, or buy back its Firm obligation, rather than declare Force Majeure.  ECF 141 at 29.  Thus, the issue of "causation" currently before the Court is whether Winter Storm Uri resulted in curtailed well production and Marathon's inability to access the Midship Pipeline, which in turn made Marathon's performance

under the Contract impracticable.  The inquiry into whether Winter Storm Uri caused Mathon's performance to be impracticable "is necessarily very fact-driven, informed by a host of environmental conditions including not only the weather, but also infrastructure, markets, and industry norms." *Arkansas Oklahoma Gas Corp. v. BP Energy Co.*, 642 F. Supp. 3d 802, 807 (W.D. Ark. 2022).

### 1(a)   Curtailed Production

In support of its Motion for Summary Judgment, Marathon submits the report of expert witness John C. McBeath, which states that during Winter Storm Uri Marathon's wells "were experiencing problems with frozen lines, water lines and compressors, as well as numerous other specific issues."  ECF 151-4 at 7.  Attached to McBeath's report is a "summary of Marathon wells and the problems they were experiencing during the winter storm," showing that 42 of 82 wells were "down."  *Id.* at 104-08.  In addition, Marathon relies on an exhibit to McBeath's report titled "Daily Cumulative Gas Data:  Koch Wells," which shows a dip in production during the claimed force majeure period.  *Id.* at 148.

Koch responds that Marathon has failed to demonstrate that Winter Storm Uri caused curtailed production in the specific wells that would "flow into this contract" and that "more general" evidence of decreased production fails to demonstrate as a matter of law that Marathon was excused from performance by Force Majeure.  ECF 160-17 at 4.  Koch further argues that the list of wells in McBeath's report do not

"represent all of Marathon's natural gas production in Oklahoma." *Id.* Koch argues that Marathon's evidence does not "substantiate any link between Marathon's failure to deliver at the Bennington Hub with alleged production problems at wells . . .." ECF 160 at 18. The Court agrees that whether Marathon's failure to deliver at Bennington Hub resulted from the curtailed production demonstrated in the record continues to present an issue of fact. Thus, Marathon has failed to prove it is entitled to judgment as a matter of law based on the evidence of curtailed production contained in the record.

### 1(b)   Inability to access Midship Pipeline

Marathon further asserts that its failure to perform was caused by Winter Storm Uri "because its gas could not access the Midship Pipeline when the processing plants that served as the on-ramp declared force majeure." ECF 164 at 12. Marathon presents evidence demonstrating the shut-down of the ONEOK Canadian Valley plant, the WEX Grady plant, and Enlink (which operated the Chisholm and Cana plants) during Winter Storm Uri. ECF 151-6; ECF 151-7; ECF 151-8; ECF 151-9.

Koch, however, has presented some evidence that the Midship Pipeline continued to flow gas throughout the force majeure period, including from the Chisholm, Canadian Valley, and Grady plants. ECF 160 at 10-12; ECF 160-5; ECF 160-6; ECF 160-9. Koch also submitted evidence that Marathon held "imbalances," or extra volumes of gas, at its processing plants during the force majeure period. ECF

160 at 14-16; ECF 160-13; ECF 160-14; ECF 160-15.  Koch argues that because it has presented evidence showing the Midship Pipeline never declared force majeure, and Marathon held gas "imbalances" available at processing plants connected to Midship, that Marathon has failed to demonstrate as a matter of law, that its failure to perform was due to upstream well production or processing plant issues.

In its Reply, Marathon characterizes Koch's arguments as unrealistic and a repeated attempt to hold Marathon to an "impossible" standard instead of the correct "impracticable" standard.   ECF 164 at 7.   Marathon also characterizes Koch's arguments about Midship's operational capacity as a "red herring" because it is undisputed that production at Marathon's wells was curtailed and that processing plants with access to the Midship pipeline declared force majeure.  ECF 164 at 8-12. Further, Marathon argues that having an "imbalance" on a spread sheet differs from, and does not demonstrate, that Marathon had available gas it could have delivered to Koch on the Midship Pipeline.  *Id.*

Like the Court in *Arkansas Oklahoma Gas Corp.*, this Court finds that whether or to what extent Marathon's performance was caused by Winter Storm Uri, requires the weighing of evidence and an assessment of the credibility of witnesses, tasks that "are not appropriate for summary judgment."   *Id.*   The parties have presented competing evidence from which a jury must decide whether curtailed well production caused by Winter Storm Uri was specific to Marathon's ability to deliver gas to Koch

on the Midship Pipeline.  Similarly, because both sides have presented competing evidence regarding Marathon's ability to access the Midship Pipeline, a jury must decide whether or to what extent Marathon was still able to move gas to Bennington Hub via Midship and whether the gas "imbalances" cited by Koch reflect actual gas being held at processing plants for Marathon or simply reflect a means for reconciling or accounting for gas transactions.

**2. Fact issues preclude a finding as a matter of law that Marathon made "reasonable efforts" to avoid the adverse impacts of Winter Storm Uri.**

Even if Winter Storm Uri caused Marathon's well production to plummet and made the Midship Pipeline inaccessible, Marathon still must prove that it made "reasonable efforts" to avoid the impacts of Winter Storm Uri and "to remedy the condition and to resume the performance of [its] obligations with reasonable dispatch."  ECF 151-1 at 10.  Marathon contends it has satisfied this burden because Koch has not disputed the evidence that Marathon's "field personnel worked tirelessly to keep production online and to restore lost production" and that it "proactively attempted to mitigate the effects of the storm by filling methanol tanks, reducing the volumes in water and oil tanks to increase capacity, and renting mobile steam generators and motor graders."  ECF 164 at 13.

Koch argues Marathon should have taken other reasonable steps to mitigate the effects of Winter Storm Uri, such as following up on Midship's representation to

Marathon that the pipeline would "try to do whatever [it could]" to ship gas for Marathon, and using excess gas held at processing plants connected to Midship to meet its delivery obligations to Koch.  ECF 160 at 12; ECF 160-8; ECF 160 at 15-16. Koch further suggests that Marathon could have investigated the possibility of flowing "below the meter minimum" into the Midship Pipeline, or delivered gas that it was selling into the "OGT pool," or purchased gas on the "spot market" for delivery to Koch.  ECF 160-2 at 7-8.

Recently, the issue of "reasonable efforts" in the context of whether Winter Storm Uri excused performance under a gas delivery contract was addressed in *Unit Petroleum Co. v. Koch Energy Servs.*, No. 4:21-CV-01260, 2023 WL 4828375, at *3 (S.D. Tex. July 27, 2023).  There, the district court explained that reasonableness "is a question of fact that must be answered by looking to the circumstances of the case, including 'the nature of the proposed contract, the purposes of the parties, the course of dealing between them, and any relevant usages of trade.'"  *Id.* (quoting *Ergon-W. Virginia, Inc. v. Dynegy Mktg. & Trade*, 706 F.3d 419, 425 (5th Cir. 2013)).  The district court denied summary judgment in *Unit Petroleum Co.* because the parties' respective expert witnesses disagreed about the "reasonable" actions that should have been taken in order to avoid the effects of Winter Storm Uri.

As previously noted, the Court has already ruled that Marathon was not required to ship gas on a pipeline other than Midship or to deliver gas to a location

other than the Bennington Hub, and also that Marathon was not required to purchase gas on the "spot market."  ECF 141.  Certainly, Marathon has presented a rejoinder to each of Koch's other "reasonable efforts" arguments, (*see* ECF 164), but Koch has submitted sufficient evidence to create fact issues that preclude summary judgment. *See, e.g.,* ECF 160-2; ECF 160-18.  The Court cannot say as a matter of law that Marathon used, or did not use, reasonable efforts to mitigate the effects of Winter Storm Uri.  Just as a jury must decide whether Winter Storm Uri caused performance by Marathon to be impracticable, a jury must also decide whether Marathon made reasonable efforts to avoid the effects of Winter Storm Uri, including whether it could have ended the Force Majeure period sooner.

### 3. Fact issues preclude a finding as a matter of law that none of the exclusions in § 11.3 prevented Marathon's invocation of Force Majeure.

Marathon's failure to perform under the Base Contract will not be excused by force majeure if: (i) its failure to perform was based on the curtailment of transportation and the "primary, in-path, Firm transportation" was not also curtailed; (ii) it failed to remedy the condition and to resume performance with reasonable dispatch; or (iii) its failure to perform was based on economic hardship.  ECF 151-1 at 10, § 11.3.  Koch's primary contention in this case is that Marathon's claims of curtailed transportation and decreased well production are just pretext for its "economic decision to avoid performance and resell gas elsewhere at record high

prices." ECF 160 at 2.

In support of this contention and in Response to Marathon's Motion for Summary Judgment, Koch cites to evidence showing that Midship Pipeline never declared force majeure; Midship continued to flow gas throughout the entire force majeure period, including from the Chisholm, Canadian Valley, and Grady processing plants; and Midship informed Marathon that the pipeline would do whatever it could to transport whatever volume of gas Marathon needed.  ECF 160 at 11-12; ECF 160-5; ECF 160-6; ECF 160-8.   Koch also points to the testimony of Marathon's representative Whelihan that Marathon resold gas it considered "trapped" at the Canadian Valley, WEX Grady, and Chisholm due to the inaccessibility of Midship, and provides a list of over a dozen deals Marathon made for gas that Koch contends Marathon could have flowed into the Midship Pipeline.  ECF 160 at 12; ECF 160-2.

The determination of whether any of the exclusions in § 11.3 apply to Marathon's declaration of Force Majeure is inextricably interwoven with whether Winter Storm Uri caused the Midship Pipeline to be inaccessible to Marathon's gas and whether Marathon used reasonable efforts to avoid the Storm's adverse impacts. The fact that Marathon took advantage of the opportunity to resell gas at a higher price is *irrelevant* if it was impracticable for Marathon to deliver gas to Koch at the Bennington Hub via the Midship Pipeline.  *See LNG Americas, Inc.*, 2023 WL 2920940 at *8 (finding in the context of force majeure that the standard for preventing

performance is impracticability, not impossibility).   But again, whether it was impracticable for Marathon to deliver gas to Koch at the Bennington Hub via the Midship Pipeline is a question of fact that depends on many variables and requires the weighing of expert testimony and the assessment of witness credibility.  *Arkansas Oklahoma Gas Corp. v. BP Energy Co.*, 642 F. Supp. 3d 802, 807 (W.D. Ark. 2022).

For these reasons, the Court recommends that Marathon's Motion for Summary Judgment on its declaratory judgment and breach of contract claims against Koch be DENIED.

### B.  Marathon's Breach of Contract claim

Under Texas law, the essential elements of a claim for breach of contract are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff as a result of the defendant's breach." *Williams v. Wells Fargo Bank, N.A*., 884 F.3d 239, 244 (5th Cir. 2018) (Texas state court citations omitted).  Koch sent Marathon a letter dated March 12, 2021, seeking $9,820,964 in "cover damages" due to Marathon's failure to deliver gas during the claimed force majeure period.  ECF 151-17.  Marathon sent Koch an invoice dated March 15, 2021 for $22,150,134.74 for delivery of gas in February 2021 as contemplated by § 7.1 of the Base Contract.  ECF 151-16.  Marathon did not pay Koch $9,820,964.  Koch notified Marathon on March 25, 2021, that it was withholding the disputed $9.8 million from its payment of the

March 15, 2021 invoice pursuant to §§ 3.2 and 7.3 of the Base Contract.  ECF 151-18.  Marathon asserts that Koch breached § 7.7 of the Base Contract when it "netted" approximately $9.8 million from its payment of Marathon's February 2021 invoice for delivery of undisputed quantifies of gas.  ECF 151 at 13-14.

Section 7 of the Base Contract addresses "BILLING PAYMENT AND AUDIT" and sets forth the circumstances under which a party is entitled to "net" amounts due under an invoice:

> 7.1.    Seller shall invoice Buyer for Gas delivered and received in the preceding Month and for any other applicable charges, providing supporting documentation acceptable in industry practice to support the amount charged.  If the actual quantity delivered is not known by the billing date, billing will be prepared based on the quantity of Scheduled Gas.  The invoiced quantity will then be adjusted to the actual quantity on the following Month's billing or as soon thereafter as actual delivery information is available.

> 7.2.    Buyer shall remit the amount due under Section 7.1 in the manner specified in the Base Contract, in immediately available funds, on or before the later of the Payment Date or 10 Days after receipt of the invoice by Buyer . . . .

> 7.3.    In the event payments become due pursuant to Sections 3.2 or 3.3, the performing party may submit an invoice to the nonperforming party for an accelerated payment setting forth the basis upon which the invoiced amount was calculated.  Payment from the nonperforming party will be due five Business Days after receipt of invoice.

> 7.4.    If the invoiced party, in good faith, disputes the amount of any such invoice or any part thereof, such invoiced party will pay such amount as it concedes to be correct; provided, however, if the invoiced party disputes the amount due, it must provide supporting documentation acceptable in industry practice to support the amount paid or disputed without undue delay.  In the event the parties are unable to resolve such

dispute, either party may pursue any remedy available at law or in equity to enforce its rights pursuant to this Section.

7.7.   . . . [T]he parties shall net all undisputed amounts due and owing, and/or past due, arising under the Contract such that the party owing the greater amount shall make a single payment of the net amount to the other party in accordance with Section 7; provided that no payment required to be made pursuant to the terms of any Credit Support Obligation or pursuant to Section 7.3 shall be subject to netting under this Section.  If the parties have executed a separate netting agreement, the terms and conditions therein shall prevail to the extent inconsistent herewith.

ECF 151-1 at 6-7.  Section 3.2, referenced above in § 7.3, is the Base Contract's cover damages provision, which provides the following exclusive remedy in the event of a breach by the Seller:

The sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of the following: (i) in the event of a breach by Seller on any Day(s), payment by Seller to Buyer in an amount equal to the positive difference, if any, between the purchase price paid by Buyer utilizing the Cover Standard and the Contract Price, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s), multiplied by the difference between the Contract Quantity and the quantity actually delivered by Seller for such Day(s) excluding any quantity for which no replacement is available; . . ..

ECF 151-1 at 5.  Koch's notice to Marathon specifically cited §§ 7.4 and 3.2 as the basis for its right to withhold payment of approximately $9.8 million dollars from the amount due to Marathon.  ECF 151-18.

Koch's position that it was entitled to withhold approximately $9.8 million dollars from its payment to Marathon is not supported by the plain terms of the Base

Contract.  The procedure for a party challenging an invoice is set forth in § 7.4 of the Base Contract, which contemplates that a party challenging an invoice must "provide supporting documentation . . . without undue delay."  Section 7.4 further provides that if the parties could not resolve the dispute, the party seeking payment is authorized "to pursue any remedy available at law or in equity to enforce its rights."  Here, Koch did not challenge Marathon's March 15, 2021 invoice, but was asserting its right to cover damages under § 3.2.  Nothing in § 7 of the Base Contract permits Koch to net its cover damages from Marathon's March 15, 2021 invoice.  In fact, § 7.7 expressly prohibits Koch from netting the amounts it believed it was owed as cover damages from the payment Koch owed to Marathon for delivered gas:  "no payment required to be made pursuant to . . . Section 7.3 shall be subject to netting under this Section."

Koch now argues that § 10.2 of the Base Contract entitled it to withhold payment of the approximately $9.8 million in cover damages.  ECF 160 at 23-25.  Section 10.2 of the Base Contract appears in the Section titled "FINANCIAL RESPONSIBILITY" and provides as follows:

> 10.2. In the event (each an "Event of Default") either party (the "Defaulting Party") or its Guarantor shall: (i) make an assignment or any general arrangement for the benefit of creditors; (ii) file a petition or otherwise commence, authorize, or acquiesce in the commencement of a proceeding or case under any bankruptcy or similar law for the protection of creditors or have such petition filed or proceeding commenced against it; (iii) otherwise become bankrupt or insolvent (however evidenced); (iv) be unable to pay its debts as they fall due: (v) have a receiver, provisional liquidator, conservator, custodian, trustee or other similar official appointed with respect to it or substantially all of its assets; (vi)

> fail to perform any obligation to the other party with respect to any Credit Support Obligations relating to the Contract; (vii) fail to give Adequate Assurance of Performance under Section 10.1 within 48 hours but at least one Business Day of a written request by the other party; (viii) not have paid any amount due the other party hereunder on or before the second Business Day following written Notice that such payment is due; or (ix) be the affected party with respect to any Additional Event of Default; then the other party (the "Non-Defaulting Party") shall have the right, at its sole election, to immediately withhold and/or suspend deliveries or payments upon Notice and/or to terminate and liquidate the transactions under the Contract, in the manner provided in Section 10.3, in addition to any and all other remedies available hereunder.

ECF 151-1 at 8.  Koch's own characterization of the approximately $9.8 million dollar demand is that the amount represents damages to which Koch is entitled as a result of Marathon's alleged breach of contract when it failed to perform during Winter Storm Uri.  A demand for cover damages does not constitute an "amount due" to Koch within the provisions of § 10.2(viii).  Rather, Koch's demand for damages for an alleged breach of contract is governed by § 3.2.  In addition, Koch never notified Marathon that Marathon had defaulted on the payment of Koch's invoice for approximately $9.8 million in damages and that therefore Koch was withholding payments under § 10.2.  *See* ECF 151-18.

No fact issues preclude summary judgment on Marathon's claim that Koch breached the Base Contract by impermissibly netting $9.8 million from the undisputed amounts Koch owed to Marathon for the March 15, 2021 invoice.  Thus, Marathon is entitled to summary judgment on its claim against Koch for breach of contract.

## IV.    Conclusion and Recommendation

For the reasons discussed above, the Court recommends that Marathon's Motion for Summary Judgment (ECF 151) be DENIED as to Marathon's declaratory judgment claim; DENIED as to Koch's breach of contract counterclaim; and GRANTED as to Marathon's breach of contract claim.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(C).   Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), superseded by statute on other grounds.

Signed on February 05, 2024, at Houston, Texas.

Christina A. Bryan
United States Magistrate Judge