United States District Court
Southern District of Texas
**ENTERED**
March 28, 2025
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARATHON OIL COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-21-1262 |
| | § | |
| KOCH ENERGY SERVICES, LLC, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Marathon Oil Co. ("Marathon") brought this action against Koch Energy Services, LLC ("Koch") seeking declaratory judgment that Winter Storm Uri was a force majeure event under the parties' natural gas contract and that Marathon's delivery obligation was thereby excused.[1] Pending before the court are Marathon Oil Co.'s Rule 16(c)(2)(A) Motion Regarding the Proper Measure of Spot Price Damages ("Marathon's Rule 16 Motion") (Docket Entry No. 221) and Marathon Oil Company's Motion to Exclude Certain Supplemental Expert Opinions of David Lerman Under Rule 702 ("Marathon's Motion to Exclude") (Docket Entry No. 223). For the reasons stated below, Marathon's Rule 16 Motion will be denied, and Marathon's Motion to Exclude will be granted in part and denied in part.

---

[1]Plaintiff's First Amended Petition ("Marathon's Petition"), Exhibit B to Defendant's Notice of Removal, Docket Entry No. 1-2, p. 8 ¶ 39. Koch counterclaimed for breach of contract. Defendant Koch Energy Services, LLC's Second Amended Answer, Affirmative Defense, and Counterclaim to Plaintiff's First Amended Petition ("Koch's Answer"), Docket Entry No. 25, p. 7 ¶ 53. All page numbers reference the pagination imprinted at the top of the page by the court's Electronic Case Filing system.

## I.  **Background**

On October 1, 2009, the parties entered a Base Contract for Sale and Purchase of Natural Gas ("Base Contract"), providing general terms to govern natural gas sales by Marathon to Koch.[2] The parties entered transactions under the Base Contract obligating Marathon to deliver 50,000 MMBTUs of natural gas to Koch each day in February 2021 at the Bennington Hub delivery point.[3]   The Contract Price is defined by reference to the price for the "NGPL Texok zone."[4]  In the Base Contract, which is modeled on a standard form published by the North American Energy Standards Board ("NAESB"), the parties elected that damages for undelivered gas would be calculated based an a "Spot Price Standard."[5]   The Spot Price Standard states:

> The sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of . . . (i) . . . payment by [Marathon] to [Koch] in an amount equal to <u>the difference between the Contract Quantity and the actual quantity delivered</u> by [Marathon] and received by [Koch] for such Day(s), <u>multiplied by the positive difference, if any,</u>

[2]Base Contract, Exhibit 1 to Marathon's Rule 16 Motion, Docket Entry No. 221-1, pp. 1, 3 § 1.1.

[3]Physical Transaction Confirmation, Exhibit 2 to Marathon's Rule 16 Motion, Docket Entry No. 221-2, p. 1; Physical Transaction Confirmation, Exhibit 3 to Marathon's Rule 16 Motion, Docket Entry No. 221-3, p. 1.   The court refers to the Base Contract together with the Transaction Confirmations collectively as "the Contract."

[4]Id.

[5]Base Contract, Exhibit 1 to Marathon Oil Co.'s Rule 16 Motion, Docket Entry No. 221-1, p. 2 § 3.2.

<u>obtained by subtracting the Contract Price from the Spot Price</u>[.][6]

The Spot Price is defined as "the price listed in [Platts Gas Daily Midpoint], under the listing applicable to <u>the geographic location closest in proximity to [Bennington Hub]</u> for the relevant Day[.]"[7] Koch contends that the Platts listing location closest to Bennington Hub (measured "as the crow flies") is the OGT Pool index in Oklahoma, 41 miles away.[8]  It is undisputed that the OGT Pool and Bennington Hub are not connected by pipeline and that gas cannot flow from one to the other.[9]  Marathon argues that the NGPL Texok index should apply even though it is 128 miles from the Bennington Hub because it is the closest geographic location that natural gas can access by pipeline from Bennington Hub.

---

[6]<u>Id.</u> at 6 § 3.2 (emphasis added).

[7]<u>Id.</u> at 5 § 2.31 (emphasis added).

[8]Marathon also challenges Lerman's use of Google Maps to measure straight-line distances.  Marathon's Rule 16 Motion, Docket Entry No. 221, p. 3 n.3.  Without fully delving into this factual dispute, it appears Lerman used the Google Maps straight-line distance tool correctly.  <u>See</u> Expert Report of David B. Lerman ("Lerman Expert Report"), Exhibit 2 to Marathon Oil Company's Motion to Exclude Expert Opinions of David Lerman Under Rule 702 ("Marathon's Motion to Exclude Lerman Opinions"), Docket Entry No. 120-2, p. 72.  Moreover, courts have treated Google Maps as a reliable tool for measuring distances, even taking judicial notice of Google Maps distances.  <u>United States v. Schultz,</u> 537 F. App'x 702, 705 n.1 (9th Cir. 2013) ("We may take judicial notice of maps, including Google Maps, to determine distances and locations.").

[9]Koch stipulates that "it is commercially unreasonable and unfeasible to transport gas from the OGT Pool to the Bennington Hub." Joint Pretrial Order, Docket Entry No. 224, p. 13 ¶ 19. Likewise, neither party has argued that gas can physically flow from Bennington to the OGT Pool.

The Base Contract states that damages under the Spot Price Standard are "the sole and exclusive remedy" for "a breach of a Firm obligation to deliver or receive Gas[.]"[10]  It also states:

FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY. . . . IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A TRANSACTION, A PARTY'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY. SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED.  UNLESS EXPRESSLY HEREIN PROVIDED, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE.[11]

The parties dispute whether Marathon's declaration of force majeure during Winter Storm Uri was valid and, to the extent the force majeure declaration was invalid, what damages are owed.  Koch argued previously that Marathon's force majeure declaration was invalid in part because Marathon could have met its obligation by purchasing spot market gas to deliver to Koch.  The court granted partial summary judgment to Marathon on the issue, holding that Marathon was not obligated to purchase spot market gas during Winter Storm Uri before declaring force majeure.[12]

The Supplemental Report of David B. Lerman ("Lerman Supplemental Report") includes damages calculated under "Lost

---

[10]Base Contract, Exhibit 4 to Marathon's Motion to Exclude, Docket Entry No. 223-4, p. 6 § 3.2.

[11]Id. at 10 § 13.

[12]Memorandum and Recommendation, Docket Entry No. 141, pp. 25-27.

Opportunity Models[.]"[13] Lerman's Supplemental Report states that he is performing this analysis because of the dispute regarding the Spot Price. The model purports to calculate the profits Koch lost because of Marathon's breach. The model "evaluate[s] the revenues [Koch] would have earned had it received natural gas from [Marathon] at Bennington Hub and paid the Contract Price, and then sold that gas at . . . the Spot Price that existed on the OGT Pool market during the Winter Weather Event."[14] Although gas cannot flow between the Bennington Hub and the OGT Pool, Lerman concludes that Koch could have sold Bennington gas on the OGT Pool market based on two events during Uri. First, Lerman points to a pair of transactions between Marathon and Koch: Marathon "bought back 20,000 MMBtus at $50/MMbtu at the Bennington Hub and then [Marathon] resold that natural gas to [Koch] at $300/MMBtu" at an upstream location that could flow into the OGT Pool.[15] Second, Lerman points to an offer made by a Marathon trader during Uri "to sell [Koch] natural gas at the Bennington Hub price but receive the natural gas in basin at Canadian Valley [which flows into the OGT Pool]."[16]

During a force majeure declaration, the Base Contract requires Marathon to "(ii) . . . remedy the condition and to resume the

---

[13]Lerman Supplemental Report, Exhibit 1 to Marathon's Motion to Exclude, Docket Entry No. 223-1, p. 50.

[14]Id. at 55-56 ¶ 126.

[15]Id. at 56 ¶ 127 and 57 ¶ 130.

[16]Id. at 58 ¶ 133.

performance . . . with reasonable dispatch[.]"[17] Lerman opines in
his Supplemental Report that this requires "[p]urchasing natural
gas in advance of anticipated supply cuts" and "purchas[ing] more
gas during the weather event to compensate" for shortfalls to the
extent such purchases are "reasonable under the circumstances[.]"[18]

Marathon filed its Rule 16 Motion on February 6, 2025, Koch
responded, and Marathon replied.[19] Koch filed a proposed surreply,
which the court read and considered in evaluating Marathon's
Rule 16 Motion.[20] Marathon filed its Motion to Exclude on
February 6, 2025, Koch responded, and Marathon replied.[21]

---

[17]Base Contract, Exhibit 4 to Marathon's Motion to Exclude,
Docket Entry No. 223-4, p. 10 § 11.3.

[18]Lerman Supplemental Report, Exhibit 1 to Marathon's Motion
to Exclude, Docket Entry No. 223-1, p. 32 ¶ 65.

[19]Marathon's Rule 16 Motion, Docket Entry No. 221; Koch
Energy's Response to Marathon's Rule 16(c)(2)(A) Motion Regrading
the Proper Measure of Spot Price Damages ("Koch's Rule 16
Response"), Docket Entry No. 249; Marathon Oil Co.'s Reply in
Support of Its Rule 16(c)(2)(A) Motion Regarding the Proper Measure
of Spot Price Damages ("Marathon's Rule 16 Reply"), Docket Entry
No. 255.

[20]Koch Energy's Surreply to Marathon's Rule 16 Motion,
Exhibit A to Koch Energy's Opposed Motion for Leave to File
Surreply Responding to Marathon's Rule 16 Motion (Doc. 220), Docket
Entry No. 259-1.

[21]Marathon's Motion to Exclude, Docket Entry No. 223; Koch
Energy's Responses to Marathon's Motion to Exclude Supplemental
Expert Opinions of David Lerman ("Koch's Rule 702 Response"),
Docket Entry No. 244; Plaintiff Marathon Oil Company's Reply in
Support of Its Motion to Exclude Supplemental Expert Opinions of
David Lerman, Docket Entry No. 256.

## II.  **Legal Standards**

### A.  **Texas Contract Law**

The parties agree, that "[t]his matter is governed by Texas law."[22]  "In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983).  "We also give words their plain, common, or generally accepted meaning unless the contract shows that the parties used words in a technical or different sense."  Plains Exploration & Production Co. v. Torch Energy Advisors Inc., 473 S.W.3d 296, 305 (Tex. 2015).  "Courts may look to dictionaries to discern the meaning of a commonly used term that the contract does not define." In re Davenport, 522 S.W.3d 452, 457 (Tex. 2017).

"'A contract is not ambiguous if the contract's language can be given a certain or definite meaning.'"  North Shore Energy, L.L.C. v. Harkins, 501 S.W.3d 598, 602 (Tex. 2016).  "'On the other hand, a contract is ambiguous if it is susceptible to more than one reasonable interpretation.'"  Id.  "Extrinsic evidence cannot be used to create ambiguity within a contract, but it may be admitted if the court determines that the contract is ambiguous."  Rosetta Resources Operating, LP v. Martin, 645 S.W.3d 212, 219 (Tex. 2022).

Texas courts "avoid strictly construing an instrument's language if it would lead to absurd results." Kourosh Hemyari v.

---

[22]Joint Pretrial Order, Docket Entry No. 224, p. 16 ¶ 1.

<u>Stephens,</u> 355 S.W.3d 623, 626 (Tex. 2011) (per curiam). "But 'the absurdity safety valve is reserved for truly exceptional cases, and mere oddity does not equal absurdity.'" <u>Rodriguez v. Safeco Insurance Co. of Indiana,</u> 684 S.W.3d 789, 795–96 (Tex. 2024). "Instead, the result must land in the realm of the 'unthinkable or unfathomable.'" <u>Id.</u> at 796.

**B.    Federal Rule of Evidence 702**

Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify . . . if the proponent demonstrates to the court that it is more likely than not that:

(a) <u>the expert's</u> scientific, technical, or other specialized <u>knowledge will help the trier of fact</u> to understand the evidence or <u>to determine a fact in issue;</u>

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (emphasis added). "[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.,</u> 113 S. Ct. 2786, 2795 (1993).[23]

---

[23]This obligation also applies to non-scientific expert testimony, including testimony based on technical and other specialized knowledge. <u>Kumho Tire Co., Ltd. v. Carmichael,</u> 119 S. Ct. 1167, 1171 (1999).

### III.  <u>Analysis</u>

**A.   Marathon's Rule 16 Motion**

   1.   <u>Marathon's Reading of the Spot Price Definition</u>

   Marathon argues that the Spot Price is based on the closest downstream Platts location from Bennington, with distance measured by the length of the pipeline connection.[24]  Marathon argues that its reading is implied by the context of the agreement as a whole: "the geographic location closest in proximity to Bennington Hub must be decided with reference to the rest of the Base Contract, which pertains to transportation of natural gas, and the pathway through which gas flows between delivery and receipt points."[25]

   The parties' dispute depends on the meaning of the words: "closest in proximity."  The relevant dictionary definitions are somewhat general.  <u>Merriam-Webster</u> defines "close" as "being near in time, space, effect, or degree,"; "proximity" as "the quality or state of being [very near]"; and "in close proximity" as "near to each other."[26]  <u>Black's Law Dictionary</u> defines "proximity" as "[t]he

---

   [24]Marathon's Rule 16 Reply, Docket Entry No. 255, p. 2 ("Accordingly, the geographic distances must be measured by the physical pipelines used to move the gas and the nearest point of delivery on them."), p. 3 n.4 ("Marathon is arguing that distance should be measured to the nearest place where delivery can occur, <u>i.e.,</u> at a location downstream from Bennington Hub.").

   [25]<u>Id.</u> at 2.

   [26]"Close." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/close;   "Proximity." Merriam-Webster.com   Dictionary,   Merriam-Webster, https://www.merriam-webster.com/dictionary/proximity; "Proximate." Merriam-Webster.com  Dictionary,  Merriam-Webster,  https://www. (continued...)

-9-

quality, state, or condition of being near in time, place, order, or relation."[27]    These definitions speak in terms of physical distance, but physical distance can be measured multiple ways, including straight line and or path-of-travel (which in this context is pipeline length).    Take for example the "in close proximity" definition.    Two places might be "near to each other" in that the straight-line distance between them is short or they might be "near to each other" in the context of a transportation network in that the connection between them is short.

American Jurisprudence (Second) summarizes the caselaw regarding an analogous question — how to measure statutory distance when no method is specified:

> In the absence of any specific statutory provision governing the manner of measurement of distances, distance is to be measured along the shortest straight line, on a horizontal plane, and not along the course of a highway or along the usual traveled way.
>
> However, the ordinary, usual, and shortest route of public travel may be measured where the context indicates that the distance referred to is to be traveled.

79 Am. Jur. 2d Weights and Measures § 45 (Measurement of distance, generally) (collecting cases).

Marathon cites a Fifth Circuit opinion that exemplifies the second part of this American Jurisprudence summary.    In Bellum v.

---

[26](...continued)
merriam-webster.com/dictionary/proximate; "In close proximity." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/in%20close%20proximity.

[27]PROXIMITY, Black's Law Dictionary (12th ed. 2024).

PCE Constructors, Inc., 407 F.3d 734, 739 (5th Cir. 2005), the court analyzed whether an employee qualified for medical leave guaranteed by the Family and Medical Leave Act (FMLA). An exception to the FMLA guarantee applies "'if the total number of employees employed by the employer within 75 miles of [the employee's] worksite is less than 50.'" Id. at 738 (quoting 29 U.S.C. § 2611(2)(B)(ii)). Whether the plaintiff fell within this exception depended on whether distance was measured as the crow flies or by public roads. Id. The court stated that because the "unmistakable" purpose of the exception is "to relieve the burden of FMLA compliance on companies with widely dispersed operations it would make no sense" to measure by straight-line distance. Id. at 739.[28] The court gave the hypothetical of a company with locations on opposite sides of the Grand Canyon, 25 miles apart as the crow flies but separated by a 120-mile drive. Id.

The Fifth Circuit's opinion in Bellum is a good example of the rule that context can indicate a method other than straight-line distance. Its reasoning heavily relied on the fact that public-road distance corresponds to the "unmistakable" purpose of the FMLA exception — compliance burden.[29]

---

[28]The Fifth Circuit gave Chevron deference to and upheld a regulation stating that the distance was to be measured by public roads. Id. at 740. It is clear from the court's analysis that it considered public-road distance to be the better measure based on the statutory context.

[29]Marathon also cites North Side LLC v. O'Neill Maintenance, 316 A.3d 1046 (Pa. Super. 2024). Unlike the parties' Contract, the statute at issue in North Side specified straight-line measurement
(continued...)

-11-

The context surrounding the Spot Price definition does not suggest pipeline distance.  It is reasonable to infer that the purpose of the Spot Price definition is to approximate the spot price at Bennington Hub.  During Winter Storm Uri, it appears that the OGT Pool was a bad approximation of the Bennington price.  But one after-the-fact data point is not sufficient context to show that the parties intended a measurement other than straight-line.[30] Based on the expert reports in this action, the gas price at a particular point depends both on pipeline connections and local supply and demand.[31]

Because context does not indicate that the parties intended a different method of measurement, straight-line distance is the most natural reading.  Marathon argues that the Spot Price location must be downstream of the Bennington Hub.  But the contract's relevant language — "the geographic location closest in proximity to the Delivery Point" — is direction-neutral.[32]  Even if the proper

---

[29](...continued)
for one statutory distance but was silent as to another.  Id. at 1053.  The court therefore does not consider North Side relevant.

[30]Even if measuring by straight-line distance yielded modestly worse Spot Price approximations, it could still be preferable because it is simpler than measuring pipelines, which can be circuitous and could require checking many different branches in a pipeline web.

[31]Expert Report of Bob Broxson, Exhibit B to Koch Energy's Motion to Exclude Expert Opinions of Bob Broxson, Docket Entry No. 173-2, pp. 12-13 ¶ 4.14; Lerman Expert Report, Exhibit 2 to Marathon's Motion to Exclude Lerman Opinions, Docket Entry No. 120-2, p. 13 ¶ 28.

[32]Base Contract, Exhibit 1 to Marathon Oil Co.'s Rule 16 Motion, Docket Entry No. 221-1, p. 5 § 2.31.

measure was pipeline length, there is no text or context suggesting that only downstream locations would count. Because Marathon has not shown that context indicates a measurement other than straight-line distance and because the relevant language cannot be read as limited to downstream locations, Marathon's Rule 16 Motion will be denied.

### 2.   Marathon's Penalty Argument

Marathon argues that calculating spot price damages based on the OGT Pool Platts prices would amount to an impermissible penalty under Texas law. "[A]n enforceable liquidated damages contract provision establishes an 'acceptable measure of damages that parties stipulate in advance will be assessed in the event of a contract breach.'" Atrium Medical Center, LP v. Houston Red C LLC, 595 S.W.3d 188, 192 (Tex. 2020). "A damages provision that violates the rule of just compensation, however, and functions as a penalty, is unenforceable." Id. Texas "courts will enforce liquidated damages provisions when:   (1) 'the harm caused by the breach is incapable or difficult of estimation,' and (2) 'the amount of liquidated damages called for is a reasonable forecast of just compensation.'" Id. (quoting Phillips v. Phillips, 820 S.W.2d 785, 788 (Tex. 1991)).   But even if a party satisfies these requirements, "[w]hen a contract's damages estimate proves inaccurate, and a significant difference exists between actual and

-13-

liquidated damages, a court must not enforce the provision." Id.
at 193.[33]

The parties have not briefed either of the first two
requirements for enforcement of a liquidated damages provision.
However, Marathon argues that calculating spot price damages based
on OGT Pool prices would result in an unacceptable disparity
between the Spot Price Standard and actual damages.[34]    In
particular, Marathon argues that Koch's actual damages are
approximately $6 million and that Koch calculates its Spot Price
damages to be approximately $123 million.[35]  Marathon argues that
Koch therefore "should [] not be permitted to present its current
damages model to the jury[.]"[36]

None of Marathon's cited authority, or any authority found by
the court, requires the court to rule on the enforceability of a
liquidated damages provision before trial.  In fact, many opinions
acknowledge that although the "enforceab[ility of a] liquidated
damages provision . . . is a question of law for the court to
decide . . . [s]ometimes, however, factual issues must be resolved

---

[33]Courts also use the language of "unacceptable disparity" or
"unbridgeable discrepancy" in stating this rule.  Id.  The case law
does not offer any accepted formula or threshold for determining if
liquidated damages are disproportionate.

[34]Marathon's Rule 16 Motion, Docket Entry No. 221, p. 7.

[35]Id.; see also Koch's Rule 16 Response, Docket Entry No. 249,
pp. 8-9; Joint Pretrial Order, Docket Entry No. 224, p. 13
¶¶ 16-17.

[36]Marathon's Rule 16 Motion, Docket Entry No. 221, p. 6.

before the legal question can be decided[.]" <u>Phillips</u>, 820 S.W.2d at 788.[37]   In particular, comparing liquidated and actual damages requires a determination of actual damages.  <u>See</u> <u>id.</u>  Although Koch stipulates in the Joint Pretrial Order to an amount it spent on replacement gas, it argues that this amount does not reflect the full amount of actual damages.[38]

Moreover, resolving the enforceability of the liquidated damages provision before trial would require the court to address at least one apparently novel question of Texas law.  Because there were different Platts prices for some of the days that Marathon allegedly breached, the disparity between the Spot Price Standard and actual damages changed each day.  Is the court to determine whether there is an "unbridgeable discrepancy" between the Spot Price Standard and the actual damages for each day of the alleged breach or for the entire period?  The jury might determine that Marathon's force majeure declaration was justified for all undelivered volumes of gas, thus eliminating any claims for damages by Koch.[39]  Alternatively, the jury might determine that the force

---

[37]<u>See also</u> <u>Garden Ridge, L.P. v. Advance International, Inc.</u>, 403 S.W.3d 432, 444 (Tex. App.—Houston [14th Dist.] 2013) ("[T]he <u>Phillips</u> court indicated that in some cases the jury might have to resolve a factual issue before the trial court can decide the ultimate legal question of enforceability[.]").

[38]Joint Pretrial Order, Docket Entry No. 224, p. 13 ¶¶ 16-17; Koch's Rule 16 Response, Docket Entry No. 249, p. 23 ("Koch Energy's actual damages are not limited to <u>cover</u> costs.").

[39]<u>See</u> Memorandum and Recommendation, Docket Entry No. 198, pp. 8-9 (holding that fact issues exist regarding whether Winter Storm Uri caused Marathon's performance to be impracticable).

majeure declaration was justified for some days and volumes but not for others.[40]  Because a jury verdict could moot Marathon's penalty argument in whole or in part, judicial economy and avoidance of novel state law questions favor deferring the penalty analysis until after trial.  See Sullivan v. Ford Motor Co., No. 97 CIV. 0593(SS), 1998 WL 60972, at *5 (S.D.N.Y. Feb. 13, 1998) ("Moreover, because additional fact-finding on the . . . issue might render a determination on this difficult and novel state law question unnecessary, the Court will not attempt to decide it until that fact-finding has been completed.").

There is no authority holding that "Koch should [] not be permitted to present [the Spot Price Standard] to the jury."[41] Where a liquidated damages provision is challenged as a penalty, Texas law places the burden of proving actual damages on the party challenging the provision. Phillips, 820 S.W.2d at 788 ("[T]o show that a liquidated damages provision is unreasonable because the actual damages incurred were much less than the amount contracted for, a defendant may be required to prove what the actual damages were."); Oetting v. Flake Uniform & Linen Service, Inc., 553 S.W.2d 793, 795 (Tex. Civ. App.—Fort Worth 1977) ("The defendant, by both allegation and proof, must raise the issue and assume the burden of

---

[40]See id. at 14 (holding that fact issues exist as to "whether Marathon made reasonable efforts to avoid the effects of Winter Storm Uri, including whether it could have ended the Force Majeure period sooner").

[41]Marathon's Rule 16 Motion, Docket Entry No. 221, p. 6.

-16-

proving the amount of the actual damages for the purpose of showing an absence of approximation between the actual loss and the stipulated sum.").[42]   The jury would thus be asked to make two damages findings — one for spot price damages and one for actual damages.

## B.   Marathon's Motion to Exclude

### 1.   Lerman's Lost Opportunity Models

Marathon argues that, under the Base Contract, Koch cannot recover lost profits. The Base Contract states that the Spot Price Standard is the sole and exclusive remedy for a failure to deliver gas.[43]   Under Texas law, if a liquidated damages provision is unenforceable, actual damages apply instead.   <u>Baker v. International Record Syndicate, Inc.</u>, 812 S.W.2d 53, 55 (Tex. App.—Dallas 1991) ("If the liquidated damages are shown to be disproportionate to the actual damages, then the liquidated damages can be declared a penalty and recovery limited to actual damages proven.").   Actual damages "encompass[] both 'direct' and

---

[42]<u>See also</u> <u>Arcturus Corp. v. Espada Operating, LLC,</u> Number 13-13-00713-CV, 2016 WL 4272381, at *6 (Tex. App.—Corpus Christi Aug. 11, 2016) ("[T]he party asserting the defense is required to prove the amount of the other parties' actual damages, if any, to show that the liquidated damages are not an approximation of the stipulated sum."); <u>Johnson Engineers, Inc. v. Tri-Water Supply Corp.</u>, 582 S.W.2d 555, 557 (Tex. Civ. App.—Texarkana 1979) ("In order to meet this burden, appellant was obliged to prove the amount of appellee's actual damages, if any, for the purpose of showing an absence of an approximation between the actual loss and the stipulated sum.").

[43]Base Contract, Exhibit 4 to Marathon's Motion to Exclude, Docket Entry No. 223-4, p. 6 § 3.2, p. 10 § 13.

-17-

'consequential' damages." DaimlerChrysler Motors Co., LLC v. Manuel, 362 S.W.3d 160, 179 (Tex. App.—Fort Worth 2012). "Lost profits may be in the form of direct damages, that is, profits lost on the contract itself, or in the form of consequential damages, such as profits lost on other contracts or relationships resulting from the breach." Hoppenstein Properties, Inc. v. McLennan County Appraisal District, 341 S.W.3d 16, 21 (Tex. App.—Waco 2010). Under background Texas law, a lost profits model may be admissible where the enforceability of a liquidated damages provision is in question.

But under the Base Contract lost profits are not available regardless of whether the Spot Price provision applies. Section 13 states that "NEITHER PARTY SHALL BE LIABLE FOR . . . LOST PROFITS . . . BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE."[44] Pointing to the reference to statute, tort, or contract, Koch argues that this sentence only applies where a party seeks lost profits "based on a source outside of the Base Contract[.]"[45] The court finds no such limitation. The court reads the phrase "by statute, in tort or contract, under any indemnity provision or otherwise" to mean that no lost profits are available. As a matter of law, lost profits are not available under the Base Contract whether or not the Spot Price Standard is

_____

[44]Id. at 10 § 13.

[45]Koch's Rule 702 Response, Docket Entry No. 244, p. 5 (emphasis omitted).

-18-

enforceable.    Lerman's "Lost Opportunity Models" therefore would not "help the [jury]. . . to determine a fact in issue[.]"  Fed. R. Evid. 702(a); see also Daubert, 113 S. Ct. at 2795 ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is . . . relevant[.]").

 2.    Lerman's Opinion Regarding Spot Market Gas Purchasing

Lerman's Supplemental Report states:

> When a Force Majeure Event occurs, [Marathon] is obligated to use reasonable efforts to avoid the adverse impacts in the first place and to resume performance after the fact.   Purchasing natural gas in advance of anticipated supply cuts ensure[s] a seller has extra "cushion" to absorb any production losses. If production losses exceed what the supplier initially anticipated, the supplier can purchase more gas during the weather event to compensate.   Those methods were available to [Marathon], and [Marathon] and other market participants regularly use both methods to avoid impacts of Force Majeure events.    If those methods are not reasonable under the circumstances, then [Marathon] would not need to undertake them.[46]

Marathon argues that Lerman's opinion is contrary to the court's summary judgment ruling that **"[t]he Contract does not obligate Marathon to buy gas on the spot market."**[47]  That ruling addressed whether Marathon was obligated to purchase spot market gas before or instead of declaring force majeure.[48]  The court later ruled that whether Marathon made "reasonable efforts" to avoid the adverse

---

[46]Lerman Supplemental Report, Exhibit 1 to Marathon's Motion to Exclude, Docket Entry No. 223-1, p. 32 ¶ 65.

[47]Memorandum and Recommendation, Docket Entry No. 141, p. 25.

[48]See id. at 25-27.

-19-

effects of the force majeure event, as required by the Base Contract, is a disputed fact issue.[49]  The court clarified the scope of these summary judgment rulings at a status conference, stating that Koch is "entitled to put on the full panoply of what you think reasonable efforts are . . . But you're not entitled to say [Marathon] couldn't declare force majeure because they could have procured gas on the spot market."[50]

Lerman will not be permitted to opine that a gas supplier must purchase available spot market gas before or instead of declaring force majeure.   But Lerman may give testimony, if otherwise admissible under Rule 702, that is relevant to Koch's argument that purchasing spot market gas was a "reasonable effort" required under the circumstances.

Marathon also objects to the foundation of Lerman's opinion. This objection is denied.   If Koch offers this testimony from Lerman at trial, the court, after considering the foundation laid by Koch and any objections raised by Marathon, will rule on the admissibility of the testimony.  Marathon's Motion to Exclude will therefore be denied as to Lerman's opinion regarding the purchase of spot market gas.

## IV.  Conclusion

The "geographic location closest in proximity to" Bennington Hub, as used in the Base Contract's Spot Price definition, means

---

[49]Memorandum and Recommendation, Docket Entry No. 198, p. 12.

[50]Transcript of Status Conference, Docket Entry No. 215, p. 6 lines 23-25, p. 7 lines 1-2.

the closest Platts location as measured by straight-line distance — not downstream pipeline length.  Moreover, Marathon's challenge to the enforceability of the Spot Price Standard depends on the resolution of remaining fact issues.  Marathon Oil Co.'s Rule 16(c)(2)(A) Motion Regarding the Proper Measure of Spot Price Damages (Docket Entry No. 221) is therefore **DENIED**.

Lost profits are not available under the Base Contract regardless of whether or not the Spot Price Standard is enforceable.  Lerman's lost opportunity models are therefore not relevant to a fact issue, and the models and any testimony about them will not be allowed at trial.  Lerman's opinion regarding industry custom and practice, if otherwise admissible, may be offered as evidence that purchasing gas was a reasonable effort required by the Contract.  Marathon Oil Company's Motion to Exclude Certain Supplemental Expert Opinions of David Lerman Under Rule 702 (Docket Entry No. 223) is therefore **GRANTED IN PART** and **DENIED IN PART**.

The court may consider other pending motions at the April 8, 2025, docket call.

**SIGNED** at Houston, Texas, on this 28th day of March, 2025.

_____
SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE

-21-