**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| MARATHON OIL COMPANY | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| | § | |
| v. | § | Civil Action No. 4:21-CV-1262 |
| | § | |
| | § | |
| KOCH ENERGY SERVICES, LLC | § | |
| | § | |
| Defendant. | § | |

---

**MARATHON OIL CO.'S MOTION**
**FOR JUDGMENT AS A MATTER OF LAW**

---

Marathon Oil Company moves for judgment as a matter of law ("JMOL") under Federal

Rule of Civil Procedure 50(a) on Koch Energy Services, LLC's damages claims and on Marathon's

force majeure affirmative defense.

**INTRODUCTION**

Marathon acknowledges that the Court, in rejecting Koch's oral JMOL motion, stated its

belief that there are fact issues in the case that will go to the jury. Marathon respectfully files this

written JMOL motion to preserve arguments it intends to make in the event of an adverse verdict.

*See Arsement v. Spinnaker Expl. Co.*, 400 F.3d 238, 247 (5th Cir. 2005) ("If a party fails to raise

an issue in its Rule 50(a)(1) motions at trial, it may not do so in its post-trial Rule 50(b) motion.").

**LEGAL STANDARD**

Judgment as a matter of law is required if, after a party has been fully heard on an issue

during a jury trial, "a reasonable jury would not have a legally sufficient evidentiary basis to find

for a party on an issue." Fed. R. Civ. P. 50(a); *see Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23

F.4th 422, 431 (5th Cir. 2022). The Court considers "all of the evidence, drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party." *Wantou*, 23 F.4th at 431. The central question is whether "the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Id.*; *see also United States for use of Wallace v. Flintco Inc.*, 143 F.3d 955, 968 (5th Cir. 1998) (party with burden of proof is entitled to judgment as a matter of law if it "has conclusively established all the elements of its claim with evidence that the jury cannot reject").

## ARGUMENT AND AUTHORITIES

### I.    Koch's liquidated damages remedy fails as a matter of law.

#### A.    Marathon has conclusively established that the liquidated damages provision in Section 3.2 is an unenforceable penalty.

Marathon has conclusively established that the liquidated damages provision in Section 3.2 of the Base Contract, as applied in this case, amounts to an unenforceable penalty.

"[W]hen a contract's damages estimate proves inaccurate, and a significant difference exists between actual and liquidated damages, a court must not enforce the provision." *Marathon Oil Co. v. Koch Energy Servs.*, 2025 WL 950085, at *6 (S.D. Tex. Mar. 28, 2025) (Lake, J.) (quoting *Atrium Med. Ctr., LP v. Hous. Red C LLC*, 595 S.W.3d 188, 193 (Tex. 2020)).

Given the Court's ruling that the Spot Price is determined by the OGT index, the evidence conclusively established that Section 3.2's liquidated damages measure would result in a maximum **$123 million award**. Given the Court's ruling that the Bennington Hub market price controls, the evidence also conclusively established that Koch's actual damages cannot exceed **$8 million**. This results in a roughly 15-1 ratio of liquidated damages to actual damages.[1]

---

[1] Any reduction in the liquidated damages award based on a jury finding that force majeure applied on a particular day would result in a proportional reduction to actual damages and thus wouldn't impact the ratio.

There is thus an "unbridgeable discrepancy," which renders the liquidated damages provision unenforceable. *Atrium*, 595 S.W.3d at 198. In *FPL Energy, LLC v. TXU Portfolio Management Co., L.P.*, the Texas Supreme Court rejected the enforcement of a liquidated damages provision where the contract damages were $29 million but the actual damages were $6.16 million. 426 S.W.3d 59, 72 (Tex. 2014). ***This case presents a far greater discrepancy.*** And when "there is an unbridgeable discrepancy between liquidated damages provisions as written and the unfortunate reality in application, [courts] cannot enforce such provisions." *Id.* at 72; *see, e.g., Aircraft Holding Sol., LLC v. Learjet, Inc.*, No. 18-CV-0823, 2023 WL 2518329, at *16 (invalidating a liquidated damages provision as applied) (N.D. Tex. Mar. 14, 2023); *Shops at Legacy (RPAI) L.P. v. Del Frisco's Grille of Tex., LLC*, No. 05-19-01274-CV, 2020 WL 4745548, at *5 (Tex. App.—Dallas Aug. 17, 2020, pet. denied) (mem. op.) (same).[2]

### B.    By choosing to cover, Koch waived any right to liquidated damages, and is estopped from seeking any such damages.

Marathon has conclusively established Koch waived any right to liquidated damages and is estopped from seeking them, no reasonable juror could find otherwise, and the evidence is legally insufficient to support any contrary finding.

Texas recognizes both waiver and estoppel of contract rights. *See Safeco Ins. Co. of Am. v. Clear Vision Windshield Repair, LLC*, 564 S.W.3d 913, 919–20 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (Busby, J.) ("Under contract law, a party may waive rights included in the contract for its benefit."); *Brooks v. Brooks*, 257 S.W.3d 418, 423–24 (Tex. App.—Fort Worth 2008, pet. denied) ("Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken."). Here, Koch elected to cover rather than pursue

---

[2] *See also* Restatement (Second) of Contracts § 356 (1981) ("A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.").

full market-value damages. It therefore waived and is estopped from pursuing full market-value damages. Any other result would essentially offer Koch better terms than it deemed commercially adequate at the time.

## II.    Koch's claim for backup "actual damages" (upon failure of its liquidated damages claim) fails as a matter of law.

### A.    Koch pled itself out of cover damages.

In response to this Court's directive to state "in writing what you contend to be the actual damages" and to provide supporting documentation (4/10/25 Tr. at 21-22), Koch filed a notice with this Court, and sent Marathon's counsel a letter, contending that "[t]he measure of damages for the non-delivery [of gas] is the difference between the market price at the time when the buyer learned of the breach and the contract price," citing Tex. Bus. & Comm. Code § 2.713(a). (Doc. 266 at 3; Doc. 267-1.) Koch did not claim it was entitled to cover damages; in fact, it specifically disclaimed them: "In selecting the Base Contract's Spot Price Standard and rejecting the Cover Standard, the parties elected to utilize the market value of the undelievered gas at the time of delivery as the proper measure of damages." (Doc. 266.) Thus, Koch pled itself out of cover damages by failing to disclose them in response to this Court's directive.

### B.    Koch's choice to cover precluded its claim for market value damages.

Any claim to market value damages also fails as a matter of law. Numerous Texas courts—and leading Texas law and UCC authorities—confirm that Section 2.711 of the Business and Commerce Code contemplates an either/or choice: either cover or seek market value damages. "[U]pon a failed delivery, a buyer "may elect to 'cover' by purchasing substitute goods and recover damages, or it may elect to simply recover damages without attempting to cover." *Bayer Corp. v. Dx Terminals, Ltd.*, 214 S.W.3d 586, 605 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). "But once a buyer obtains cover, damages are to be calculated in context of the price paid for the

cover." *Id.*; *see Meuller v. McGill*, 870 S.W.2d 673, 675 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (same); *Gulf Coast Env't Sys. LLC v. TKS Control Sys.*, No. H-08-1080, 2008 WL 2704766, at * 3 (S.D. Tex. July 7, 2008) (holding that under the Texas version of the UCC, a seller's failure to deliver goods entitles the buyer to cover *or* recover the difference between the market price and contract price for the goods).[3] It is undisputed that Koch decided to cover. It therefore cannot also pursue market-value damages.

> **C.     Marathon has conclusively established that Koch failed to show any harm resulting from uncovered volumes.**

Marathon has conclusively established that, upon failure of liquidation provision, Koch has not shown any harm resulting from the uncovered volumes, no reasonable jury could find otherwise, and the evidence is legally insufficient to support any contrary finding.

It is undisputed that Koch covered approximately 30,300 volumes of the undelivered gas on February 17, 18, and 19 and all the undelivered gas on February 20. (Joint Ex. 1.) Koch also admitted that it effectively covered the remaining 19,700 volumes through a buyback from its corporate affiliate Koch Energy Services Southeast (KES-SE) at the following prices:

---

[3] *See also* 1 White, Summers & Hillman, Uniform Commercial Code § 7:19 (6th ed.) ("[B]oth the message of Comment 5 to § 2-713 and the policy of the Code *properly deny the covering buyer any use of §2-713*") (emphasis added); 14 William Dorsaneo *et al.*, TEXAS LITIGATION GUIDE § 210.31, ¶5(b) ("If the buyer chooses cover, the buyer is apparently *restricted to the remedy under § 2.712* and *may not recover damages for the market/contract differential* under § 2.713.") (emphasis added).

**INTERROGATORY NO. 19:** Identify the natural gas You purchased on the spot market at Bennington Hub or bought back at the Bennington Hub during the claimed force majeure period, including the volume, delivery pipeline, price, and counterparty.

> **ANSWER:** Koch Energy objects to the phrase "claimed force majeure period" and vague and assumes this term refers to the time period Marathon invoked force majeure, *i.e.*, February 12–February 24, 2021.
>
> Additionally, Koch Energy directs Marathon to its response to Interrogatory No. 17, which sets out the spot market and/or cover transactions Koch Energy executed to make up for the shortfall of gas Marathon failed to deliver at the Bennington Hub in February 2021. The relevant buyback transactions that were executed at the Bennington Hub during February 12–24, 2021 are listed below:

| Gas Day | Counterparty | Volume | Buyback Price |
|---------|--------------|--------|---------------|
| GD17 | KES SE | 19,700 | $31.13 |
| GD18 | KES SE | 19,700 | $24.96 |
| GD19 | KES SE | 20,190 | $7.45 |
| GD20 | KES SE | 20,190 | $4.10 |

(*See* Koch's Response to Marathon's Rog. 19.)

Koch's own witness, Nick Sankowski, explained that KES-SE had contracted to take 20,000 MMBtu/day of the Marathon gas for delivery to the Southeast via downstream pipelines but that due to the extreme demand and high prices in Oklahoma, Koch decided to "buy back" this 20,000 MMBtu/day from its affiliate in order to keep the gas in Oklahoma, where it was more urgently needed and more valuable. (5-1 Day 4 PM Tr., at 91-92.)

The implications are two-fold. *First*, Koch likely made a huge *profit*, not a loss, by buying back these volumes at $31.13, $24.96, $7.45, and $4.10 and selling the gas at the prevailing daily gas prices in Oklahoma—but Koch refused to disclose the profits it made in the downstream transactions during discovery. *Second*, at a minimum, the Koch Energy entity that is the party to this case at most has cover damages associated with these gas volumes (the buyback price minus the contract price), and is thus not entitled to market value damages on these volumes.

### III.    Marathon has established its force majeure defense as a matter of law.

In another Winter Storm Uri case, this Court determined that a producer (Chevron) had conclusively established its force majeure defense **as a matter of law** (on summary judgment) under remarkably similar circumstances. *See LNG Americas, Inc. v. Chevron Nat. Gas*, No. H-21-2226, 2023 WL 2920940, at *11 (S.D. Tex. Apr. 12, 2023) (Lake, J.). The same principles require the same outcome here.

The Court has already laid out the analytical framework for establishing Force Majeure as a matter of law under the Base Contract:

> [I]n order to meet its summary judgment burden to establish the affirmative defense of Force Majeure as a matter of law, Marathon must demonstrate that: (1) Winter Storm Uri was an event 'not reasonably within the control' of Marathon (§ 11.1), and falls within the scope of weather related events described in § 11.2(ii); (2) Marathon's failure to perform under the Base Contract was 'caused by' Winter Storm Uri (§ 11.1); (3) Marathon made reasonable efforts to avoid the adverse impacts of Winter Storm Uri (§ 11.2); (4) Marathon's entitlement to the benefit of force majeure is not precluded by the conditions set forth in § 11.3[, such as economic hardship,]; and (5) Marathon gave Koch written notice it was declaring Force Majeure with 'reasonably full particulars' as soon as 'reasonably possible' (§ 11.5).

*Marathon Oil Co. v. Koch Energy Servs., LLC*, No. 21-CV-1262, 2024 WL 759396, at *4 (S.D. Tex. Feb. 5, 2024) (Bryan, M.J.), *mem. and recommendation adopted*, 2024 WL 761890 (S.D. Tex. Feb. 23, 2024) (Lake, J.). Koch does not dispute that Marathon has satisfied the first and fifth elements. (Doc. 271, p. 16 at n.18.)

#### A.    Element 2: Causation.

On the second element, the evidence conclusively establishes that Marathon's failure to perform under the Base Contract "was caused by Winter Storm Uri," no reasonable juror could find otherwise, and the evidence is legally insufficient to support any contrary finding. *Marathon*, 2024 WL 759396, at *4.

**Dramatic Impact on Marathon's Production and Operations.** Marathon's own production data and expert testimony established that over half of its wells went offline during Winter Storm Uri, resulting in a more than 66% drop in production. This was not unique to Marathon—industry-wide data showed a massive, unprecedented reduction in gas production across Oklahoma and the entire region during the storm. (5-1 Day 4 AM Tr. at 13, 5-1 Day 4 AM Tr. at 63-65, 5-1 Day 4 AM Tr. at 211.) Experts such as Mr. McBeath and Ms. Adair confirmed that the storm's severity and duration were unlike anything previously experienced.

Testimony from Marathon's field and trading personnel described how freezing temperatures, snow, and ice made roads impassable, prevented access to well sites, and caused widespread equipment failures, including frozen compressors, metering errors, and power outages (4-29 Day 2 Tr. at 67, 5-1 Day 4 AM Tr. at 46).

**Disruption at Processing Plants and Pipeline Access.** The Canadian Valley Plant 2, which was critical for moving gas onto the Midship Pipeline for delivery to Koch, lost power and was shut down during the storm. Other plants, such as WEX Grady and EnLink Cana, also experienced compressor failures and power outages, leading to force majeure declarations by those facilities. (5-1 Day 4 AM Tr. at 70-71, 5-1 Day 4 AM Tr. at 74.)

Even though the Midship Pipeline itself did not declare force majeure, Marathon could not physically get gas onto the pipeline both because the processing plants were down and wells were not producing. There were days (February 17 and 18) when there was no flow at all from Marathon's plants onto Midship. (5-1 Day 4 AM Tr. at 70, 5-1 Day 4 AM Tr. at 74, 5-1 Day 4 AM Tr. at 77-78.) Even as some plants began to recover, the limited volumes available were not enough to meet pipeline meter minimums, further preventing Marathon from delivering gas to Bennington Hub (5-1 Day 4 AM Tr. at 77-78). Marathon did not have the ability to reroute gas from other

8

pipelines or storage to Bennington, and the contract did not require it to do so. There was no storage at Bennington, and moving gas from other delivery points would have required breaching other firm contracts. (5-2 Day 5 AM Tr. at 20, 5-2 Day 5 AM Tr. at 57.)

Testimony and documents showed that force majeure notices were issued throughout the industry, not just by Marathon. Koch itself received and passed along force majeure notices to its own customers, confirming the regional and industry-wide impact of the storm. (5-2 Day 5 AM Tr. at 19, 5-1 Day 4 PM Tr. at 8.)

## B.    Element 3: Reasonable Efforts.

On the third element, the evidence conclusively establishes that Marathon "made reasonable efforts to avoid the adverse impacts of Winter Storm Uri" and also to resolve the impacts to resume performance, no reasonable juror could find otherwise, and the evidence is legally insufficient to support any contrary finding. Koch's assertions about what reasonable efforts Marathon failed to undertake fail as a matter of law.

- **Buyback production under the parties' contract**.

Despite earlier claiming that Marathon should have bought back its delivery obligation (Doc. 224, JPTO at p.10), Koch seemingly abandoned this argument at trial.  (4/29 Day 2 Tr. at 182.) Even if Koch were to re-assert this argument, the evidence conclusively supports a matter-of-law ruling on Koch's theory. A buyback is not a transaction that results in the physical movement of gas.  Rather, it is simply a financial transaction utilized, under normal circumstances, when a seller might have a shortfall and is not considered reasonable in the industry during a Force Majeure situation. (5-2 Day 5 AM Tr. at 16-17). Moreover, it is not required by the contract.

- **Buy replacement gas on spot market**.

Koch asserts that Marathon should have bought replacement gas no matter what the price—even if it costs $1 million/MMBtu. (5/2 Day 5 PM at 73.) But this Court has already rejected that position as a matter of law in *LNG Americas* under remarkably similar facts. This Court held:

> Plaintiff instead argues that Defendant could have obtained gas by purchasing it on the Katy Oasis spot market. For all but the last three days of missed deliveries, the cost of supplying gas from the spot market was totally disproportionate to the contract price. The reference spot price on February 14, 2021, was $149.045 per MMbtu, more than a 5,200 percent increase over the contract price. This increased to $359.14 per MMbtu on February 17, nearly 12,800 percent above the contract price, before falling to $64.32 per MMbtu by February 19, which was 2,200 percent above the contract price. The average spot prices fell to $4.68 per MMbtu for the last three days of missed deliveries, 68 percent above the contract price. The Contracts explicitly list "low temperatures which cause freezing or failures of wells" as a force majeure. If the existence of a spot market precluded force majeure, a well-freezing storm would never qualify unless all suppliers lost virtually all of their production feeding the Oasis pipeline.

*LNG Americas, Inc.*, 2023 WL 2920940, at *8. This Court also relied on the testimony of the very same expert who testified here, Bob Broxson, about industry standards not requiring the purchase of replacement gas. *Id.* at *9. And the Court made the astute observation that:

> Plaintiff's reading implies an absurd outcome during severe production losses. When there is not enough gas for all suppliers to meet their term deliveries, it becomes impossible for all of them to perform. But because they can purchase gas on the spot market, full performance by any single supplier remains technically possible. Therefore none of the suppliers could declare force majeure, even though an event had made it impossible to fill all the suppliers' obligations. Under this reading, for a loss-of-production event to completely excuse any one supplier's performance, it would have to eliminate 100% of its production feeding the Oasis Pipeline and 100% of every other supplier's production. Multiple courts have declined to read force majeure clauses as requiring unavailability of replacement gas, stating that the force majeure clause would be effectively meaningless.

*Id.* at *8 n. 66.

The evidence conclusively supports a matter-of-law ruling on Koch's replacement gas theory here, too. If every producer who declared force majeure during the storm was also required to go and buy replacement gas, it would upend an already turbulent market. Forcing producers to

buy replacement gas during a force majeure would exacerbate market shortages and drive prices astronomically higher, harming the overall market, critical infrastructure, and public interest. (5-2 Day 5 AM Tr. at 63.) Buying replacement gas is not industry standard, not required by contract, would disrupt the market, and would divert critical resources from restoring production during an unprecedented crisis. "Reasonable efforts" in a force majeure event like Winter Storm Uri are limited to restoring the producer's own production and delivering what is available, not entering the spot market to buy gas.

- **Reallocation of gas from other customers to Koch**.

This Court held in *LNG Americas* that it is not part of the seller/producer's burden to prove allocation fairness as an element of its force majeure defense, and that an allocation is presumptively fair unless proven otherwise. *LNG Americas*, 2023 WL 2920940, at *9 (citing Tex. Bus. & Com. Code § 2.615(2)) ("[A]llowing a seller declaring force majeure to 'allocate in any manner which is fair and reasonable.'").

The testimony from Marathon's gas trading team (Lois Whelihan and Kimberly Reese) and its expert (Broxson) establishes that Marathon's allocation or cut policy during a production shortage is to reduce daily sales first, then monthly deals, and finally term/seasonal deals, with the policy applied by delivery location. This approach is designed to be fair, consistent, and to avoid favoritism, and is consistent with industry practice. Koch raised no evidence or arguments to contest the presumption of fairness.

- **Shipping gas to Bennington on other pipelines**.

The evidence conclusively showed that it would not be reasonable within the industry to expect Marathon to ship gas to Bennington Hub via other pipelines under the circumstances presented here. First, any other transportation rights Marathon had on other pipelines were

11

"interruptible," meaning they were not guaranteed and could be cut at any time, especially during high-demand events like Winter Storm Uri. (4-29 Day 2 Tr. at 20-21, 102.) It is patently unreasonable to expect a producer to negotiate new transportation arrangements or amend contracts during a force majeure event, given the chaos and operational flow orders on pipelines during such events. (4-29 Day 2 Tr. at 102; 5-2 Day 5 AM Tr. at 21.) Second, the evidence established that Marathon's ability to use other pipelines was severely limited by physical and operational constraints. Marathon's gas had to be processed at specific plants before entering the pipeline system. During Winter Storm Uri, these plants (Canadian Valley, Chisholm, Cana, WEX Grady) suffered outages, power failures, and operational issues. (5-1 Day 4 AM Tr. at 56-74.) Marathon often had no gas at those locations to move, as its production was down and the plants were not operating. (5-1 Day 4 AM Tr. at 67-74.) Third, Marathon could not store gas at Bennington to wait for pipeline availability; if it could not deliver, the gas was stranded or had to be sold elsewhere to avoid shutting in wells. (4-29 Day 2 Tr. at 91.) Finally, it is not industry standard to ship via other pipelines when the Contract called for delivery on Midship. Broxson explained that requiring Marathon to take gas from another pipeline or customer to satisfy Koch would mean breaching other contracts, which is not reasonable or expected in the industry (5-2 Day 5 AM Tr. at 20, 57-58.)

### C.    Element 4: Economic Hardship.

On the fourth element, the evidence conclusively establishes that Marathon's performance was not to any extent affected by "economic hardship," no reasonable juror could find otherwise, and the evidence is legally insufficient to support any contrary finding. There is no evidence that Marathon selectively withheld gas from Koch for economic reasons. The inability to deliver was directly tied to the physical and operational impacts of Winter Storm Uri. (5-1 Day 4 AM Tr. at 13, 5-1 Day 4 AM Tr. at 65-66.) Marathon's field teams worked in dangerous, subzero conditions

to restore production, clear snow and ice, and bring wells back online as soon as possible. (5-1 Day 4 AM Tr. at  13, 5-1 Day 4 AM Tr. at 46.) As soon as any gas became available at Bennington, Marathon prioritized Koch for delivery. (4-29 Day 2 Tr. at 89-90.)

## CONCLUSION

For the reasons above and any additional reasons orally stated on the record, Marathon respectfully requests that the Court render judgment as a matter of law that Marathon prevails on its affirmative defense of force majeure and that Koch take nothing on its damages claims.

Marathon further requests all other and further relief to which it may be entitled.

Dated: May 5, 2025                              Respectfully submitted,

                                                **AHMAD, ZAVITSANOS & MENSING, PLLC**

                                                */s/ Timothy C. Shelby*
                                                Timothy C. Shelby
                                                State Bar No. 24037482
                                                Federal ID No. 39044
                                                tshelby@azalaw.com
                                                Sammy Ford IV
                                                State Bar No. 24061331
                                                Federal ID No. 950682
                                                sford@azalaw.com
                                                Paul Galante
                                                State Bar No. 24090833
                                                Federal ID No. 2742834
                                                pgalante@azalaw.com
                                                Emily Merritt Adler
                                                State Bar No. 24121009
                                                Federal ID No. 3710388
                                                eadler@azalaw.com
                                                Ab Henry
                                                State Bar No. 24131987
                                                Federal ID No. 3811478
                                                ahenry@azalaw.com
                                                Michael Gorrell
                                                State Bar No. 24131345
                                                Federal ID No. 3803195
                                                mgorrell@azalaw.com
                                                1221 McKinney, Suite 2500
                                                Houston, Texas 77010
                                                Telephone: (713) 655-1101
                                                Fax: (713) 655-0062

**HAYNES AND BOONE, LLP**

*/s/ Mark Trachtenberg*
Mark Trachtenberg
State Bar No. 24008169
Federal ID No. 24584
*Mark.Trachtenberg@haynesboone.com*
Garrett Martin
State Bar No. 24092765
Federal ID No. 3060533
*Garrett.Martin@haynesboone.com*
Ryan Philip Pitts
State Bar No. 24105941
Federal ID No. 3363232
*Ryan.Pitts@haynesboone.com*
1221 McKinney, Suite 4000
Houston, Texas 77010-2007
Telephone: (713) 547-2000
Telecopier: (713) 547-2600

**COUNSEL FOR PLAINTIFF MARATHON OIL COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2025 a true and correct copy of the foregoing was duly served via CMECF on all counsel of record.

David T. McDowell
William B. Thomas
William X. King
McDowell Hetherington, LLP
First City Tower
1001 Fannin Street, Suite 2700
Houston, Texas 770002
david.mcdowell@mhllp.com
william.thomas@mhllp.com
william.king@mhllp.com
**COUNSEL FOR DEFENDANT**

*/s/ Timothy C. Shelby*
Timothy C. Shelby

15